653 So.2d 353 (1994)
Ex parte Willie McNAIR.
(In re Willie McNAIR v. STATE of Alabama).
1930955.
Supreme Court of Alabama.
September 2, 1994.
*354 Eugene P. Spencer, Dothan, for petitioner.
James H. Evans, Atty. Gen., Beth Slate Poe, Asst. Atty. Gen., and Melissa G. Math, Deputy Atty. Gen., for respondent.
HOUSTON, Justice.
Willie McNair was indicted and convicted in Henry County for the capital offense stated in Ala.Code 1975, § 13A-5-40(a)(2), involving the murder and robbery of 68-year-old Ella Foy Riley. In a unanimous decision, the Court of Criminal Appeals on January 21, 1994, following three remands, affirmed McNair's conviction and death sentence, and it later overruled his application for rehearing. See McNair v. State, 653 So.2d 320 (Ala.Crim.App.1992); 653 So.2d 351 (Ala. Crim.App.1993); 653 So.2d 343 (Ala.Crim. App.1993); and 653 So.2d 347 (Ala.Crim.App. 1994), for a detailed statement of the facts and a discussion of the procedural history of this case. We granted certiorari review pursuant to Rule 39(c), Ala.R.App.P.
The Court of Criminal Appeals correctly resolved the issues discussed in its several opinions. We find it necessary to write to only three of those issueswhether McNair was entitled to a new trial based on the holding in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); whether McNair was entitled to a new trial based on the fact that one of the trial court's bailiffs, who had had contacts with the jury, was permitted to testify as a prosecution witness during the guilt phase of the trial; and whether there was sufficient evidence to support the trial court's finding of the aggravating circumstance set out in § 13A-5-49(8).
Relying on Batson v. Kentucky, supra, McNair contends that the prosecutor engaged in purposeful racial discrimination in *355 removing blacks from the jury venire during the guilt phase of the trial. The record shows that there were 64 members of the venire from which McNair's jury was selected. Eighteen of those members were black. The prosecutor used 11 of his 26 peremptory strikes to remove blacks. Seven blacks served on the jury.
Although the trial court made no initial finding that McNair had established a prima facie case of racial discrimination, it nonetheless required the prosecutor to state his reasons for the strikes. The prosecutor's reasons for striking the 11 blacks, as noted by the Court of Criminal Appeals, were as follows:
"1) Boatwright'has a misdemeanor in the past' and based on the recommendation of assistant district attorney Durrell Whiddon, `who knows everybody.'
"2) Brackinwas born in 1962.
"3) Bradywas born in 1966.
"4) Chittyhis brother had recently been convicted for `selling.' Chitty and his brother lived at the same residence.
"5) Fordcriminal violations and anti-law enforcement.
"6) Kellybased on information from law enforcement that he was `"unstable per family members," that he was not a stable individual in relationship in his demeanor, appearance, or actions.'
"7) Leonardborn 1908, `"slow, slow, doesn't pay attention,"' 82 years old.
"8) Marshbased on Whiddon's recommendation which was based on Whiddon's `knowing him, his reputation in the community.'
"9) McAllisterbased on Whiddon's recommendation `as not being in Henry County.'
"10) Riversborn in 1963, `we used our last strikes to strike all the people on the list that were born in the 1960's.'
"11) Thomasborn in 1965."
653 So.2d at 323.
The Court of Criminal Appeals held that no Batson violation had occurred, stating:
"After the prosecutor listed his reasons for these strikes, the trial judge inquired into the racial composition of Henry County, receiving estimates ranging from 33% to 40% for the black population of the county. Upon determining that 58% of the jury was black, the trial judge denied the appellant's `Batson' objection:
"`I'm going to deny the Batson motion. I think between the number of blacks and the reasons given by the State, and the pattern that no racially relative pattern has been shown as to their strikes.'
"Although some of the State's explanations for its peremptory strikes may be suspect under other circumstances, see Ex parte Bird, 594 So.2d 676 (Ala.1991), and despite the lack of `meaningful' voir dire concerning the basis for the strikes, see Richmond v. State, 590 So.2d 384, 386 (Ala.Crim.App.1991), we find no inference of racial discrimination because of the statistical evidence present in this case. Here, blacks composed, at most, 40% of the county population, 28% of the jury venire was black, and 58% of the jury was black.
"`When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created. Logically, if statistical evidence may be used to establish a prima facie case of discrimination, by showing a discriminatory impact, ... then it should also be available to show the absence of a discriminatory purpose.'
"Harrell v. State, 571 So.2d 1270, 1271-72 (Ala.1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991). See also Scott v. State, 599 So.2d 1222 (Ala. Crim.App.1992)."
653 So.2d at 323.
We agree with the Court of Criminal Appeals that McNair is not entitled to a new trial on the ground that the prosecutor engaged in purposeful discrimination in selecting the jury. However, contrary to the holding of the Court of Criminal Appeals, our decision is not based solely on Harrell v. State., 571 So.2d 1270, 1271-72 (Ala.1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 *356 L.Ed.2d 736 (1991). Instead, using a "totality of the circumstances" analysis, see Ex parte Branch, 526 So.2d 609 (Ala.1987), and Huntley v. State, 627 So.2d 1013 (Ala.1992), we conclude that the trial court's ruling on McNair's Batson objection was not clearly erroneous.
This Court, in Ex parte Thomas, [Ms. 1921804, September 2, 1994] ___ So.2d ___ (Ala.1994),[1] has rejected the very language in Harrell that was relied on by the Court of Criminal Appeals:
"When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created. Logically, if statistical evidence may be used to establish a prima facie case of discrimination, by showing a discriminatory impact,... then it should also be available to show the absence of a discriminatory purpose."
Harrell, 571 So.2d at 1271-72. This Court held in Thomas that a prima facie case of racial discrimination could be shown even if a greater percentage of blacks sat on the jury than sat on the lawfully established venire. In the present case, however, the trial court required the prosecutor to state his reasons for striking the blacks from the venire and then based its ruling on those reasons, as well as on the racial composition of the jury (58% black) and on its finding of no pattern of racial discrimination on the part of the prosecutor. With the case in this posture, we do not limit our inquiry to whether a greater percentage of blacks sat on the jury than sat on the lawfully established venire. All the evidence of record must be considered in reviewing the trial court's finding on the question of unlawful discrimination. Huntley, supra; Jelks v. Caputo, 607 So.2d 177 (Ala.1992).
The record shows that McNair's jury was 58% black. The jury venire was only 28% black and blacks composed, at most, only 40% of the population of Henry County. Although these facts, as previously noted, are not controlling here, they do negate a finding of a disparate impact and they weigh heavily against a finding of discriminatory intent on the part of the prosecutor. Furthermore, the reasons given by the prosecutor for his peremptory strikes do not appear, on their face, to be merely "whimsical" or "fanciful." Branch, supra, at 621.
The prosecutor stated that he had stricken jurors Boatwright and Ford on the ground that he had received information from an assistant prosecutor, Durrell Whiddon, and from law enforcement authorities, that those jurors had criminal histories. Striking a juror with a criminal history is racially neutral. See, e.g., Jackson v. State, 549 So.2d 616 (Ala.Crim.App.1989); Powell v. State, 548 So.2d 590 (Ala.Crim.App.1988), affirmed, 548 So.2d 605 (Ala.1989); Currin v. State, 535 So.2d 221 (Ala.Crim.App.1988), cert. denied, 535 So.2d 225 (Ala.1988); Nesbitt v. State, 531 So.2d 37 (Ala.Crim.App. 1987). In this respect, we note that juror Hartzog, a white juror, was struck by the prosecutor on the ground that "he had been involved in many criminal violations and was anti-law." Thus, it appears that the prosecutor acted consistently in striking those members of the venire he believed had a criminal history or were anti-law enforcement. This kind of consistency indicates racially neutral striking. Branch, supra.
The prosecutor explained that he had stricken juror Chitty on the ground that Chitty lived with a brother who had recently been convicted of a crime. Striking the relative of a person who has been convicted of a crime is racially neutral. Scott v. State, 599 So.2d 1222 (Ala.Crim.App.1992), cert. denied, Ex parte Scott, 599 So.2d 1229 (Ala.Crim. App.1992); Powell, supra; Currin, supra. We also note that the record indicates that Chitty himself had a criminal case pending against him at the time of McNair's trial and that Chitty may not have been the subject of the Batson objection.
The prosecutor stated that he had stricken juror Kelly on the ground that he had received information from law enforcement *357 authorities that Kelly was "unstable per family members" and that he "was not a stable individual in relationship in his demeanor, appearance, or actions." A juror's demeanor or attitude may be a racially neutral consideration. See Harrell, 555 So.2d 263, 268 n. 1 (Ala.1989); Scott v. State, supra.
The prosecutor stated that he had stricken juror Leonard on the ground that he was 82 years old and "slow," and jurors Bracken, Brady, Rivers, and Thomas, on the ground that they were too young (i.e., too close in age to McNair). Age may serve as a legitimate racially neutral reason for a peremptory strike, see Jelks v. Caputo, supra; Harrell, supra, at 268, n. 1; Ex parte Bird, 594 So.2d 676 (Ala.1991); especially when, as with Leonard, the age of the individual, when coupled with his demeanor, indicates inattentiveness and a general inability to follow the progress of the trial. See Nesbitt, supra. The record also indicates that the prosecutor struck whites within the same age group as jurors Bracken, Brady, Rivers, and Thomas. Again, this consistency indicates racially neutral striking on the prosecutor's part.
Finally, the prosecutor stated that he had stricken jurors Marsh and McAllister based on Whiddon's recommendations. The prosecutor stated that Whiddon had based his recommendations on Whiddon's knowledge of Marsh's apparently bad reputation within the community and on his understanding that McAllister was not from Henry County. These were legitimate nondiscriminatory reasons for striking Marsh and McAllister.
We note that Whiddon had negative responses to both black members and white members of the venire based on his personal knowledge of those individuals. We further note that McNair presented no rebuttal evidence suggesting that the prosecutor's reasons were a sham or a mere pretext for racial discrimination. Although McNair questioned the "factual basis" for the prosecutor's striking jurors Ford, Marsh, McAllister, and Kelly, heunlike the defendant in Ex parte Thomas, 601 So.2d 56 (Ala.1992) did not request to see, and was not denied access to, any of the prosecutor's supporting documents. Thomas does not require the prosecutor to lay an evidentiary foundation for every reason given in connection with the use of a peremptory strike. The trial court has a great deal of discretion in handling a Batson hearing. Thomas does prohibit the trial court from accepting at face value the prosecutor's reasons for striking blacks when the prosecutor claims to have based the strikes on a supporting document provided by investigators, the very existence of which is challenged by the defendant. This Court made it very clear in Thomas that the trial court is not always required to go "behind" a document prepared for a prosecutor by law enforcement officials in an attempt to determine its accuracy:
"[I]f the trial court had ordered the State to produce the document that it used in exercising its peremptory challenges, or if the trial court had examined the document in camera, we might be in a position to affirm, rather than being compelled, as we are, to reverse and remand."
601 So.2d at 59. As noted, McNair did not ask to see, and was not denied access to, the prosecutor's notes that had been prepared by Whiddon and other law enforcement officials. Given the substantial body of evidence in this case indicating that there was no discriminatory intent on the prosecutor's part, we refuse to extend the holding in Thomas to require a prosecutor, in every case where a Batson objection has been made, to provide an evidentiary foundation for each peremptory strike used against a black member of the venire (e.g., testimony from victims, police officers, or any other individual who may have supplied information about a member of the venire that the prosecutor believes in good faith to be true). See Smith v. State, 590 So.2d 388 (Ala.Crim.App.1991), citing Ex parte Lynn, 543 So.2d 709 (Ala.1988), cert. denied, Lynn v. Alabama, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989).
In Jelks v. Caputo, supra, at 179, this Court reiterated the standard by which cases of this kind are reviewed on appeal:
"It is within the sound discretion of the trial court to determine if peremptory challenges of black jurors were motivated *358 by intentional racial discrimination. The court's findings in this regard are afforded great deference and will not be reversed on appeal absent clear error. Ex parte Lynn, 543 So.2d 709 (Ala.1988)."
No such error has been shown in the present case.
McNair also contends that he was entitled to a new trial because one of the bailiffs was allowed to testify for the prosecution during the guilt phase of the trial. Citing Gonzales v. Beto, 405 U.S. 1052, 92 S.Ct. 1503, 31 L.Ed.2d 787 (1972), the Court of Criminal Appeals correctly disapproved this practice, but held, nonetheless, that, under the circumstances, allowing the bailiff to testify did not constitute reversible error. McNair contends, however, that it was extremely prejudicial to allow the bailiff, who, he says, had close contact with the jury, to testify for the prosecution. McNair argues that the bailiff's testimony could have left the jury with the impression that the bailiff, as an officer of the court, had formed an opinion that McNair was guilty of the capital offense charged in the indictment.
We note, as did the Court of Criminal Appeals, that a bailiff should never be put into the position of having to testify for the prosecution, as the bailiff here was. "When a key witness against a defendant doubles as the officer of the court specifically charged with the care and protection of the jurors, associating with them on both a personal and an official basis while simultaneously testifying for the prosecution, the adversary system of justice is perverted." Gonzales, supra, at 1055-56, 92 S.Ct. at 1505-06. See, also, Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). This practice has been consistently and strongly condemned by the United States Supreme Court and by this Court, and both of these courts have reversed convictions where bailiffs have been allowed to testify. See, e.g., Gonzales, supra; Miles v. State, 261 Ala. 670, 75 So.2d 479 (1954); and Chancellor v. State, 291 Ala. 413, 282 So.2d 242 (1973). However, after reviewing the record, as well as the aforementioned cases, we agree with the Court of Criminal Appeals that no reversible error occurred, given the circumstances here presented.
The bailiff's complete testimony was as follows:
"Q. Tell us your name, please, sir.
"A. Fred Deaton.
"[McNair's attorney]: Excuse me one moment, please. Could we have an instruction to the jury that just because he is a bailiff, that his testimony shouldn't be given any more weight or credibility than any other witness?
"THE COURT: Ladies and gentlemen, because the witness testifying is the bailiff, and you have seen a lot of him and will see a lot of him, you should not take that as to any matter which would give Chief Deaton's testimony any more strength than that of any other witness.
"THE COURT: Go ahead, Mr. [prosecutor].
"[Prosecutor]: Thank you, your Honor.
"Q. First of all, what's your name?
"A. Fred Deaton.
"Q. Do you have any prior law enforcement experience?
"A. A little bit.
"Q. Tell them how many years.
"A. About twenty.
"Q. And what was your position for twenty years in the city of Abbeville?
"A. Chief of police.
"Q. All right. And after you retired from the police chief here in Abbeville, did you have the occasion to work at the Henry County Sheriff's Department?
"A. Yes, sir.
"Q. What position?
"A. As a dispatcher.
"Q. And who did you work under? What sheriff?
"A. Sheriff Welcher and Sheriff Holman.
"Q. All right. And let me ask you. Were you working under Sheriff Welcher and/or Holmanexcuse meSheriff Welcher on or about May the 22nd, 1990, when there was a homicide, a capital murder case, with Ella Foy Riley?

*359 "A. Yes, sir.
"Q. All right. Was there any evidence turned over to you? Would you tell our jury?
"A. Yes, sir.
"Q. Do you know Gary Jones?
"A. Yes, sir.
"Q. Did you know him prior to that day in the community?
"A. Yes, sir.
"Q. And let me ask you. Did he turn any evidence over to you, Chief?
"A. He did.
"Q. What kind of evidence did he turn over to you?
"A. A knife blade.
"Q. All right. And when he gave it to you, what did you do with it?
"A. I kept it about twenty minutes and gave it to Chester Smith.
"Q. Did you mark, alter, or change the knife blade that he gave to you?
"A. No, sir.
"Q. And it was a complete knife blade attached with a knife?
"A. About an inch-and-a-half broken blade.
"Q. Let me show you State's Exhibit Number 59. I'll take it out and lay it in front of you and ask you, do you recognize that?
"A. Yes, sir.
"Q. Is that the knife blade he turned over to you?
"A. Yes, sir.
"Q. And while it was in your custody, you didn't change, mark, or alter it in any way, correct?
"A. No, sir.
"Q. And you turned it over to Chief Deputy Chester Smith in the Sheriff's Department; is that correct?
"A. That's correct.
"Q. Did it ever come back into your custody again, Chief Deaton?
"A. No, sir."
As his brief testimony indicates, the bailiff served only as a "link" in the chain of custody of the broken knife blade that was introduced into evidence. Although the bailiff's testimony was important to the prosecutor's case, his credibility was never an issue. In fact, McNair's attorney consented to the bailiff's testifying with respect to the chain of custody of the knife blade, stating that "that would not be a problem as far as [the bailiff] is concerned." Furthermore, after the bailiff identified himself on the witness stand, the trial court, at the request of McNair's attorney, specifically instructed the jurors that they should not "give [the bailiff's] testimony any more strength than that of any other witness." These circumstances, in conjunction with the complete absence from the record of any suggestion that the bailiff in question had an opportunity to communicate with any of the jurors outside the presence of the trial court, distinguish this case from those cases cited above.
We further note that, contrary to McNair's contention, the following colloquy between the bailiff and the prosecutor cannot reasonably be construed as having left the jury with the impression that the bailiff had formed an opinion as to McNair's guilt:
"Q. All right. And let me ask you. Were you working under Sheriff Welcher... on or about May the 22nd, 1990, when there was a homicide, a capital murder case, with Ella Foy Riley?
"A. Yes, sir."
This question and the answer, together with his other testimony, conveyed nothing more to the jury than that the bailiff was working for Sheriff Welcher when Ms. Riley was murdered and that he had participated in the investigation of what was undisputedly a "capital murder case."
McNair further contends that the intentional killing of Ms. Riley was not especially heinous, atrocious, or cruel, an aggravating circumstance on which the jury was instructed and which the trial court found to exist. See § 13A-5-49(8). McNair argues that the evidence did not support the trial court's finding that the killing was conscienceless or pitiless and unnecessarily torturous to Ms. Riley, within the meaning of Ex parte Kyzer, 399 So.2d 330 (Ala.1981). We disagree.
*360 The evidence in this case showed that Ms. Riley, a 68-year-old woman, while in the seemingly protective confines of her own home, was viciously assaulted, strangled, and stabbed by McNair, a man much larger and stronger than Ms. Riley. The evidence indicates that McNair asked Ms. Riley for a glass of water and that, while she had her back to him, he attacked her, stabbing Ms. Riley twice in the neck with a knife, one of the blows severing her carotid artery and causing a massive loss of blood. McNair left Ms. Riley, who, the evidence suggests, remained conscious for several minutes following the attack, alone on the floor of her kitchen to die. Suffice it to say that the evidence was sufficient to show that this killing was conscienceless or pitiless and unnecessarily torturous to Ms. Riley. In this regard, this case is materially indistinguishable from Ex parte Quang Ngoc Bui, 551 So.2d 1125 (Ala.1989), and Ex parte Jefferson, 473 So.2d 1110 (Ala.1985), cert. denied, Jefferson v. Alabama, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 300 (1986), wherein this aggravating circumstance was found to exist. In those cases, the victims were viciously cut with knives on and around their throats and remained alive during, and for a short time after, the attacks.
McNair has also raised here an additional issue that was not presented to either the trial court or the Court of Criminal Appeals. Citing Lee v. State, 631 So.2d 1059 (Ala.Crim.App.1993), McNair contends that no black person has presided over a grand jury in Henry County for the past 20 years. In a two-paragraph argument, he challenges the constitutionality of the method that was used in selecting the presiding juror of the grand jury that returned the indictment against him in this case. In support of his argument, McNair attached to the end of his brief an affidavit from the clerk of the Henry County Circuit Court; that affidavit purports to show the race and gender of those persons who had presided over the grand juries convened in Henry County between the fall of 1973 and the fall of 1993.
The State contends that the record shows no plain error with respect to the method of selecting grand jurors in Henry County.
The clerk's affidavit, the State argues, is outside the record and should not be considered as evidence in this case. We agree.
The record in this case is silent both with respect to the method used in Henry County to select presiding grand jurors and with respect to the racial composition of the various grand juries empaneled in Henry County for the past 20 years, i.e., there is no indication in the record that officials have ever engaged in the practice of purposeful discrimination in selecting individuals to preside over grand juries in Henry County. Under the plain error rule, this Court will "notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner." (Emphasis added.) Rule 39(k), Ala.R.App.P. As this Court stated in Ex parte Watkins, 509 So.2d 1074, 1077 (Ala. 1987), cert. denied, Watkins v. Alabama, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), "[t]he defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred." In effect, McNair is requesting that we remand this case for a hearing on this issue, on the strength of the circuit clerk's affidavit, so that a record can be created for appellate review. We specifically decline this request, for to do otherwise would unduly enlarge the scope of the plain error review as authorized by our appellate rules. See Watkins, supra, in which we had the opportunity in a death penalty case to remand for an evidentiary hearing on a Batson issue, but refused to do so.
We have considered the opinions of the Court of Criminal Appeals and the merits of all the issues raised by McNair, and we have carefully searched the record for any plain error; we have found no errors in either the guilt phase or the sentencing phase of the trial that adversely affected McNair's rights. We conclude that the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence and that the death sentence was proper *361 under the circumstances. Ala.Code 1975, § 13A-5-53(a). The judgment of the Court of Criminal Appeals is, therefore, affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, SHORES, STEAGALL and INGRAM, JJ., concur.
MADDOX, J., concurs specially.
MADDOX, Justice (concurring specially).
I concur in the affirmance. I write specially only to say that the majority, in reviewing the Batson[2] issue, cites this Court's case of Ex parte Thomas, [Ms. 1921804, September 2, 1994] ___ So.2d ___ (Ala.1994), wherein I dissented, ___ So.2d at ___.
My view of this Court's role in reviewing a Batson issue is set out in an extensive dissenting opinion in the Thomas case. There, I basically said that an appellate court, applying the principles of law set out in Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), should "decline to overturn a trial court's finding on the issue of discriminatory intent unless the appellate court is convinced that the trial court's determination is clearly erroneous." Thomas, ___ So.2d at ___ (Maddox, J., dissenting).
I write here only to say that I agree that no Batson error was shown here, but in view of the fact that the majority cites this Court's Thomas case to support its affirmance, I should not be understood as agreeing that Thomas correctly states the law. I believe that my view of the law as expressed in my dissenting opinion in Thomas is correct.
NOTES
[1] This Court issued its opinion in Thomas on May 20, 1994. However, on September 2, 1994, it withdrew that opinion and substituted another. The Court of Criminal Appeals had decided McNair's appeal before we issued that May 20, 1994, Thomas opinion.
[2] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).