[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 411 
This Court granted Raymond Eugene Brown's petition for the writ of certiorari to review the judgment of the Court of Criminal Appeals affirming his conviction of capital murder and his sentence of death. See Brown v. State, 686 So.2d 385
(Ala.Cr.App. 1995).
This is the third time this case has been before us. On May 13, 1988, Brown was convicted of two capital murders, based on the deaths of Linda LeMonte and her daughter, Sheila Smoke. After the sentencing hearing, the jury unanimously recommended death by electrocution. The trial court accepted the advisory verdict and sentenced Brown to death. In Brown v. State,571 So.2d 345 (Ala.Cr.App. 1990), the Court of Criminal Appeals reversed Brown's convictions and his sentence, holding that the trial court's refusal to individually voir dire potential jurors regarding possible prejudice from pretrial publicity had denied Brown the due process guaranteed under the United States Constitution. This Court granted the State's petition for the writ of certiorari to the Court of Criminal Appeals, but after hearing oral argument quashed the writ as improvidently granted. Brown v. State, 571 So.2d 353 (Ala. 1990).
Subsequently, the State sought certiorari review in the United States Supreme Court. On June 10, 1991, that Court vacated the judgment of the Court of Criminal Appeals and remanded the cause for reconsideration in light of Mu'Min v.Virginia, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) (addressing federal constitutional requirements as to voir dire
on the issue of pretrial publicity). Alabama v. Brown,501 U.S. 1201, 111 S.Ct. 2791, 115 L.Ed.2d 966 (1991). On July 26, 1991, the Court of Criminal Appeals reinstated its judgment reversing the conviction and sentence. Brown v. State, 586 So.2d 991 *Page 412 
(Ala.Cr.App. 1991). On April 10, 1992, this Court reversed that judgment, holding that the trial judge's general voir dire
complied with the constitutional requirements articulated inMu'Min. Brown v. State, 632 So.2d 14 (Ala. 1992).
The Court of Criminal Appeals thereafter again remanded this cause to the trial court on the authority of Powers v. Ohio,499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991),[1] with directions that the State be required to justify its use of 20 of its 23 peremptory strikes to remove black veniremembers from the prospective jury panel. Brown v. State, 632 So.2d 17
(Ala.Cr.App. 1992). The trial judge conducted a hearing in accordance with the remand order and, with the following order, concluded that the State's explanations were race-neutral:
 "Brown was convicted in this court on March 29, 1988 and sentenced to death by electrocution for the double murder of a woman and her child after having previously being convicted of murder. Both the defendant and the victims were white and this case carried no racial overtones.
 "The record in this case shows that the venire from which the jury was struck consisted of 74 persons, 9 of which (including 1 black person) were excused from service by this court, and 7 of which (including 2 black people) were struck for cause. Three black persons actually served on the trial jury in this case and one of the alternate jurors was also black. Of the state's strikes in this case 20 of 23 were black. Of the defense strikes 1 of 23 were black.
 "After hearing and fully considering the legal arguments and factual data presented in this hearing, which the record shows, the Court finds that the State, through its Attorney General, Jimmy Evans, has articulated clear, cogent, and sound reasons for its peremptory strikes, all being racially neutral. In making this determination this court has specifically considered the demeanor of the sworn witness for the State, evidence at the hearing, and this court's knowledge of these proceedings as trial judge in this case.
 "In addition, this Court notes for the record in this case, that in the opinion of this Court, this defendant in all respects received a fair trial in this matter.
 "In conclusion, the Court finds that the reasons stated by the State in using its peremptory strikes were/are racially neutral, and permissible under the cases of Batson v. Kentucky, 476 U.S. 79
[106 S.Ct. 1712, 90 L.Ed.2d 69] (1986), Ex parte Jackson, 516 So.2d 768 (Ala. 1986); Ex parte Branch, 526 So.2d 609 (Ala. 1987); and [Bui v. State, 627 So.2d 855 (Ala. 1992)]."
On the trial court's return to the remand, the Court of Criminal Appeals affirmed Brown's conviction and sentence of death. Brown v. State, 686 So.2d 385 (Ala.Cr.App. 1995). We have reviewed all of the issues raised by Brown. We find that many of the issues raised in this Court were adequately addressed in the January 13, 1995, opinion of the Court of Criminal Appeals. We address the following issues:
 I.
Brown challenges the trial court's holding that the State offered race-neutral reasons for using 20 of its peremptory strikes to remove blacks from the jury venire. This Court has written:
 "In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that a prosecutor may not use the state's peremptory strikes to remove venirepersons of a defendant's race solely on the assumption that they would be biased toward the defendant merely because he is of the same race. Batson granted defendants the right to require the prosecutor to explain the reasons for the strikes if the defendant has established a prima facie case of discrimination."
Bui v. State, 627 So.2d 855, 856 (Ala. 1992). The Court of Criminal Appeals, in affirming *Page 413 
the trial court's findings and holding on this issue, stated, in part:
 "In this Court's September 18, 1992 opinion, we held that a prima facie case of purposeful discrimination had been established by the defense based on the fact that the prosecution had used 20 of its 23 strikes to remove blacks from the jury and based on the history of the Montgomery County District Attorney's Office with regard to its use of peremptory strikes to remove blacks from the juries. The State urges this Court to reexamine its finding that the appellant established a prima facie case of discrimination.
 "The State argues that its pattern of strikes does not provide strong evidence of discrimination. We disagree. Here, there were 24 blacks on the venire. Defense counsel struck one black and the State struck 20 of the 23 remaining blacks on the venire. Thus, the State used 87% of its strikes to remove blacks[,] leaving a jury that was 25% black.
 " 'Statistical evidence may be used to establish a prima facie case of discrimination. In both Ex parte Bird, 594 So.2d 676 (Ala. 1991), and Ex parte Yelder, 630 So.2d 107 (Ala. 1992), the prosecution struck substantial numbers of black veniremembers. In Bird, the venire was 36% black. The State used 17 of its 20(85%) peremptory strikes to remove blacks, leaving a jury that was 8% black. In Yelder, the venire was 31% black. The State used 24 of its 32(75%) strikes to remove blacks, leaving a jury that was 16% black. With reference to both cases, the Alabama Supreme Court stated: "[T]he sheer weight of statistics such as these raises a strong inference of racial discrimination requiring clear and cogent explanations by the State in rebuttal." Ex parte Yelder, 630 So.2d at 109.'
Kidd v. State, 649 So.2d 1304 (Ala.Crim.App. 1994). See alsoEx parte Thomas, 659 So.2d 3 (Ala. 1994).
"The State also argues that the fact that the State struck whites before it struck any blacks is evidence that its pattern of strikes was not discriminatory. This Court rejected this argument in Freeman v. State, 651 So.2d 576 (Ala.Crim.App. 1994).
"The State further argues that it is the district attorney's staff, and not the district attorney himself, that has shown a history of discrimination in the use of peremptory strikes. This Court in Freeman also rejected the State's argument that the district attorney is not responsible 'for his staff's [observation of or] failure to observe the requirements ofBatson and Branch.' Freeman, 651 So.2d at 587.
During the hearing on the Batson motion, the district attorney stated that his reasons for striking the jurors were based on [reconstruction] of the notes from when the jury was struck. The district attorney stated that before he strikes a jury, the jury list is divided by the individual characteristics of the potential jurors such as 'age, sex, and race.' (Record on Return to Remand (R.R.R.) 21.) In this particular case, the district attorney stated that he was trying to compose a jury 'tailored to what we were going to do to try to debunk the insanity defense.' (R.R.R. 22.) The district attorney stated that he wished to have persons on the jury who were older, mature, married, employed, and had children.
"The following are the reasons given by the district attorney for his strikes:
 "Juror 7 (white male — age 60) was struck because he indicated that he was opposed to the death penalty and that religion was the most important thing in his life.
 "Juror 145 (white female — age 44) was struck because she had been cited for traffic violations in 1987 and because her husband was a psychologist.
 "Juror 127 (black female — age 20) was struck because she was single, young, and had no children. Her employment status was unclear. There was a question as to whether she worked at the Gayfers department store's warehouse. The district attorney had information that she worked at the Alabama [Alcoholic] Beverage Control Board warehouse and several investigations had been conducted there. The district *Page 414 
attorney felt that 'if she had worked at that A.B.C. warehouse, there was a possibility during the course of that investigation that she might have been interviewed and there might be some hostility to the office based on the investigation.' (R. 34)
 "Juror 37 (black female — age 26) was struck because she was single and had no children and because she had a minor history of traffic violations.
 "Juror 44 (black female — [age] 26) was struck because the district attorney believed she had a larceny conviction in 1987. Further, she worked at a prison and the district attorney's office was conducting an investigation of prisons at the time.
 "Juror 148 (black female — age unknown) was struck because she had a minor traffic violation and because she had a master's degree in psychology.
 "Juror 40 (black female — age 27) was struck because [she] was single, young, and had no children. She spoke in a loud and strong voice and the district attorney felt that she would not be easily persuaded by others.
 "Juror 79 (black female — age 28) was struck because she was single, relatively young, and unemployed.
 "Juror 46 (black female — age 33) was struck because she had been convicted of fraud.
 "Juror 134 (black female — age 30) was struck because she was single and had no children.
 "Juror 121 (black female — age 35) was struck because she was employed at Brockway Glass and the district attorney's office had conducted a major investigation of alleged embezzlement by employees. The district attorney did not feel 'it was in the best interest of the State to have someone who may have been employed when there was an extensive employee embezzlement there.' (R. 42)
 "Juror 72 (black female — age 40) was struck because she had been convicted of fraud.
 "Juror 87 (black male — age 42) was struck because he had a minor traffic offense and a 'child restraint violation.' The district attorney did not know what the nature of that violation was and he had 'no way of finding out at that particular time.' (R. 43)
 "Juror 117 (black male — age 22) was a college student. He was struck because he was young, unmarried, and had no children. The district attorney could not determine if he was employed.
 "Juror 143 (black male — age 21) was struck because he was single and had no children. He also had a traffic violation for driving on the wrong side of the road and the district attorney could not determine if that violation [was] the result of a plea on a charge of driving under the influence.
 "Juror 137 (black male — age 21) was struck because he was young and had no children and because he stated that religion was very important in his life. The district attorney also stated that he was unsure whether this potential juror would have trouble following the judge's instruction because he was a minister.
 "Juror 70 (black female — age 55) was stuck because she was single and had no children and it was unclear whether she worked in the mental health facilities at Baptist Hospital.
 "Juror 2 (black female — age 48) was stuck because she had a relative who had been convicted of larceny as a result of prosecution by the district attorney's office, and they lived at the same address. Furthermore, she indicated that she was a widow who did not want to be on the jury because she could not afford to take time off work.
 "Juror 19 (black female — age 61) was struck because her record showed a 1957 violation of the prohibition law and because she had a loud voice.
 "Juror 28 (black female — age 52) was struck because she indicated that religion was the most important thing in her life and because her husband was a minister.
 "Juror 71 (black female — age 45) was struck because she was single and the district attorney had no information on her *Page 415 
employment status or whether she had children.
 "Juror 144 (white female — age 39) was struck because she was a trained labor arbitration advocate and because of her religious beliefs.
 "Juror 22 (black female — age unknown) was an alternate juror. She was struck because she had traffic violations and because she worked at Baptist Hospital."
Brown v. State, 686 So.2d at 390-392. At the Batson hearing, the district attorney explained that he thought the evidence against Raymond Eugene Brown was overwhelming and that, in his opinion, the State's main burden at trial would be to "debunk the insanity defense." When offering his reasons for his strikes, he stated:
 "Well, when I try cases, I ask the staff to prepare for me a list of all jurors. I ask them to break it down by individual characteristics beginning with age, sex, and race; and I have sometimes as many as four different lists, age oriented, and I try to know everything I can about the issues in the trial of the case that are going to come up. For instance, in this case, we knew that the evidence of guilt was so overwhelming in this case and that we had to combat an insanity defense. We knew that's all it was going to be. The trial strategy on the part of the prosecution was to totally debunk any insanity defense, using as its resources Professor Ziskin and his four volumes on the insanity plea as a defense and how to combat it. It is a prosecutor's manual on how to combat the insanity defense. That was the issue, to totally debunk every witness that came in here on the insanity defense. That was our trial strategy in this case. And to compile a jury along those lines — I mean to compile a list of jurors tailored to what we were going to do to try to debunk the insanity defense.
 "Q. Is youth often a [criterion] in your office in determining who would make good jurors?
 "A. Yes, and in this case in particular because a child was murdered in this case.
 "Q. Also, what other means do you employ or does your staff employ such as do you use the City Directory?
 "A. We use the City Directory. We use, if possible, F.B.I. records when we can, A.C.J.I.S., the Alabama Criminal Justice Information System, we take the jury venire and pass it among the staff, we pass it to the investigators and to the police officers who worked the case. We get comments from anywhere we can as to whether the particular juror would make a good juror in this particular case or a particular case, depending on what our initiative and theory of our case, what legal position we are going to take, and the pleadings that have been filed.
"Q. Do you also use the juror forms?
"A. Absolutely.
"Q. All right.
 "A. For every juror in every case when I try a case.
"Q. And Department of Public Safety records?
"A. Yes.
 "Q. And municipal, circuit court, and district court records?
"A. Yes.
"Q. And answers to the voir dire questions?
"A. Yes.
 "Q. Do you look for a certain amount of maturity with jurors?
"A. Yes.
 "Q. And do you look for people who have made decisions affecting or showing maturity, job decisions, marriage decisions, etc.?
"A. Yes, ma'am.
 "Q. With that as the background, then I will ask you to go forward in discussing your strikes in this case.
"A. All right. The state's —
 "Q. One other thing or a couple of other things. This trial I believe was in 1988?
"A. Yes.
"Q. That's four years ago, March of 1988? *Page 416 
"A. Yes.
". . . .
 "Q. Why was age important particularly in the picking of this jury?
 "A. Well, first of all, you want as much responsibility, demonstrated responsibility by career choices and by mature judgment, and particularly in this case, when there is going to be a lot of conjecture and speculation concerning the insanity defense, and the older you are, the better off you are in trying to listen to a prosecutor who is out to totally debunk the insanity defense.
 "Q. What effect did the fact that a child was killed in this case have on the maturity decision?
 "A. Well, I think a tremendous amount. Particularly, you want people who have children on the jury, where possible. A young person, unemployed and childless, in my judgment, would not be as good a juror as someone who was married, employed and had children.
 "Q. Now, I am going to ask you kind of a general question. In rating jurors, when you are looking at the juror, do you try to look at everything you know about that juror, the pluses and the minuses?
 "A. I try to gather everything about that person that I can gather from the staff that would make me believe that person would be a good juror and gather everything about that person from whatever sources I have to make me believe that that person would maybe not be as good a juror as someone else. I take those notes into the courtroom and I weigh the good points against the bad points. And I try to be consistent within the confines of a rapid fire striking system."
Supplemental Record on Return to Remand, pp. 21-26. We review the reasons given by the prosecutor in light of the trial court's finding that those reasons were race-neutral. The trial court's finding will not be disturbed unless found to be clearly erroneous:
 "In Ex parte Branch, 526 So.2d 609 (Ala. 1987), we approved the Court of Criminal Appeals' use of a 'clearly erroneous' standard for reviewing factual findings by the trial court in Batson proceedings."
Bui v. State, 627 So.2d at 859. As already noted, the trial in this case occurred in 1988, before the United States Supreme Court's decision of Powers v. Ohio, 499 U.S. 400,111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); therefore, we are reviewing the striking of a 1988 jury that occurred without the benefits of the hindsight we now have concerning the development of the law in this area since Powers. Our analysis of the district attorney's strikes, set out below, indicates that the trial court's finding of no discrimination was not clearly erroneous.
The district attorney's first two strikes were against white veniremembers. The State's third strike was against Juror 127. At the Batson hearing, Mr. Evans[2] indicated that this veniremember was struck because of her age (20) and because she was single with no children. He further indicated that there was some question with regard to her employment. This Court has recognized that "the age rationale is highly suspect because of its inherent susceptibility to abuse. Batson, 476 U.S. at 106,106 S.Ct. at 1728 (Marshall, J., concurring)." Ex parte Bird,594 So.2d 676, 683 (Ala. 1991). In fact, "[a] mere summary declaration that age was a factor in the decision to strike is, therefore, constitutionally deficient and warrants reversal.Owens v. State, 531 So.2d 22, 26 (Ala.Crim.App. 1987)."Bird, at 683. Despite its susceptibility to misuse, however, this Court has also noted:
 "[W]e realize that in certain cases age may serve as a legitimate racially neutral reason for a peremptory strike. See Harrell, 555 So.2d at 268 n. 1." *Page 417 
Bird, at 682-83. The district attorney explained why he thought age was an important factor to consider when selecting jurors for this particular case. Again, with regard to age, the district attorney testified:
 "Q. Why was age important particularly in the picking of this jury?
 "A. Well, first of all, you want as much responsibility, demonstrated responsibility by career choices and by mature judgment, and particularly in this case, when there is going to be a lot of conjecture and speculation concerning the insanity defense, and the older you are, the better off you are in trying to listen to a prosecutor who is out to totally debunk the insanity defense.
 "Q. What effect did the fact that a child was killed in this case have on the maturity decision?
 "A. Well, I think a tremendous amount. Particularly, you want people who have children on the jury, where possible. A young person, unemployed and childless, in my judgment, would not be as good a juror as someone who was married, employed and had children."
Supplemental Record on Return to Remand, pp. 25-26. In addition to Juror 127, the prosecutor indicated that the following black veniremembers were also struck, at least in part, because of their age: Juror 37 (age 26); Juror 40 (age 27); Juror 79 (age 28); Juror 117 (age 22); Juror 143 (age 21); and Juror 137 (age 21). Of those veniremembers, Jurors 127,[3] 37, 40, 117, and 143 were also single, and Jurors 37, 40, 117, 143, and 137 had no children.[4] Juror 134 (age 30), was likewise struck because she was childless and single, and Juror 71 was struck because she was single. The reasoning of the district attorney for striking single veniremembers and those with no children was the same reasoning he offered for considering age to be an important factor, i.e., that, in light of the defense of insanity in this case and because a child had been murdered, the district attorney wanted jurors with as much maturity and responsibility as possible.
Although the district attorney fully explained his reasoning and how that reasoning fit in with his trial strategy, the defense contends that the striking of these jurors is highly suspect because Juror 39 (age 23) and Juror 45 (age 23), both white, ultimately served on the jury. With regard to Juror 45, the district attorney explained:
 "Well, I may have struck her had it not been for some of the strikes of the defendant; but the overriding reason was that I believe I knew — at that time, I believe that I knew her in that she lived at Route two out in the country in the Old Selma area where I grew up. . . ."
Supplemental Record on Return to Remand, p. 63. Because he thought he had a connection with this juror and her family, we find that the prosecution's failure to strike Juror 45 was not racially discriminatory. With regard to Juror 39, the district attorney gave this reason for not striking her:
 "Well, she worked for Bob Alton. Bob Alton is a friend of mine. Bob Alton was a friend of, I assume, [my] co-counsel at that time, Ellen Brooks. [Juror 39] was married. She was employed and a loan closing specialist at a law firm. She had prior jury service and had no criminal history whatsoever."
Supplemental Record on Return to Remand, pp. 62-63. Again, the district attorney articulated his reasons for not striking this veniremember, and those reasons do not support the defendant's allegations of disparate treatment on the basis of race. Juror 126 (age 26) also was not struck. The district *Page 418 
attorney gave the following reasons for not striking her:
 "Well, first of all, her parents were burglary victims. She said it made quite an impression on her when she was young. This case had immense violence to the household, to the property structure itself, and to a 9-year-old child. [Juror 126] was married, she was a customer service representative at First Alabama Bank, which is a very responsible position. Her husband was military. Her father was retired Navy. All of those things, coupled together, outweighed the 26-year-old age. . . ."
Supplemental Record on Return to Remand, p. 64. The district attorney adequately explained his reasons for not striking Juror 126 while at the same time striking black veniremembers of a similar age.
The district attorney also struck Juror 148 (a black female) who had majored in psychology in college. In explaining his reasons for striking Juror 148, the district attorney testified:
 "[S]ince we were out to assert the so-called Ziskin defense and to attack those psychological theories and other research tools that they use as being absolutely worthless and not founded in the scientific method, we certainly did not want a juror on there who had [been] indoctrinated through liberal arts education and psychology as to the [validity] of the very theories that the defendant would rely on for his defense."
Supplemental Record on Return to Remand, pp. 37-38. We conclude that the reasons given for striking this veniremember were race-neutral. In so holding, we also note that the district attorney's second strike was Juror 44 (a white female), whose husband was a psychologist. With regard to Juror 44, he stated:
 "[W]hen you are out to debunk to the jury the entire insanity defense . . . you must as a part of that debunk psychological theories that are propounded that are not based in scientific fact; and I think it's a matter of Supreme Court attention that none of the psychological theories or any of the insanity defense have ever been based on a scientific method. And when you are out to do that, you certainly don't want someone whose husband and they derive their livelihood from that profession to be on the jury."
Supplemental Record on Return to Remand, pp. 32-33. With regard to Juror 148, therefore, not only did the district attorney strike a white member of the jury venire for the same reasons, (this, in and of itself, indicates neutrality, see Ex parteBranch, 526 So.2d 609, 623 (Ala. 1987)), but he also explained that his trial strategy was to attack the insanity defense. A major part of that strategy included attempting to discredit theories that persons in the psychology field would tend to rely on. In that same vein, the district attorney struck all jurors who worked in or were connected with hospitals with mental facilities, including Jurors 70 and 22. We find those reasons to be race-neutral.
The district attorney said he struck Juror 44 because she had a larceny conviction and Jurors 46 and 72 because they had fraud convictions. Judge Taylor, in Spencer v. State,659 So.2d 1000 (Ala.Cr.App. 1994), wrote:
 "The Alabama Supreme Court recently held that a strike based on information on a prospective juror's criminal history was race-neutral in Ex parte McNair, 653 So.2d 353 (Ala. 1994). Furthermore, this court has repeatedly held that striking a juror with a criminal history does not violate Batson. See Jackson v. State, 549 So.2d 616
(Ala.Cr.App. 1989); Powell v. State, 548 So.2d 590 (Ala.Cr.App. 1988); Currin [v. State, 535 So.2d 221 (Ala.Cr.App.), cert. denied, 535 So.2d 225 (Ala. 1988)]; Nesbitt v. State, 531 So.2d 37 (Ala.Cr.App. 1987)."
659 So.2d at 1002. These strikes were clearly race-neutral.
The prosecution struck Juror 2. The district attorney testified that she was struck because she lived at the same address as a relative who had a larceny conviction.
 "Striking the relative of a person who has been convicted of a crime is racially neutral. Scott v. State, 599 So.2d 1222 (Ala.Crim.App. 1992), cert. denied, Ex parte Scott, 599 So.2d 1229
(Ala. 1992); Powell [v. *Page 419 State, 548 So.2d 590 (Ala.Crim.App. 1988)]; Currin [v. State, 535 So.2d 221 (Ala.Crim.App. 1988)]."
Ex parte McNair, 653 So.2d 353, 356 (Ala. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995). This same veniremember also stated that she was a widow and did not want to serve "because she could not afford to take time off work." We find that the district attorney's reason for striking this veniremember was race-neutral.
The State struck Juror 28 because of her deep religious beliefs[5]; however, we note that Juror 7 (white) was also struck, at least in part, because of his religious beliefs. When questioned at the Batson hearing, Mr. Evans testified:
 "Q. Did you strike all of the jurors for whom you had a reservation about religion?
"A. Absolutely."
Supplemental Record on Return to Remand, p. 66. Such similar treatment of black and white veniremembers is evidence of neutrality. Ex parte Branch, 526 So.2d 609, 623 (Ala. 1987).
Juror 19 was struck because she had a 1957 liquor prohibition violation and because she had a loud voice.
 "This Court has expressed some dismay at the use of a juror's demeanor as grounds for striking that juror in that 'it presents considerable difficulty to the trial court as well as to the reviewing authorities in determining its truthfulness.' Avery [v. State, 545 So.2d 123 at 127 (Ala.Cr.App. 1988)]."
Scott v. State, 599 So.2d 1222, 1229 (Ala.Cr.App. 1992), writ denied, 599 So.2d 1229 (Ala. 1992), overruled on other grounds,Smith v. State, 612 So.2d 1314 (Ala.Cr.App. 1992). The defense contends that the prosecution's strike of Juror 19, in particular, was racially motivated. In support of that contention, the defense points to the fact that the foreman of the jury had had a 1986 marijuana conviction and was not struck. Mr. Evans explained his failure to strike Juror 68:
 "Q. Okay. There was one juror who specifically did have — you struck all jurors with a criminal history in this case. Well, almost all of the jurors with a criminal history in this case except for number 68.
". . . .
 "A. Okay. I know he is on my list because I think he is an engineer but I want to make sure.
". . . .
 "A. . . . Well, at the time when we were going to strike this juror, I was, the pluses that he had were that he was married and had children and was 31 years old and was an engineer which I believe to be a responsible position and a professional.
 "Q. Did you consider an engineer to be an analytical position?
"A. Absolutely.
"Q. Someone who would listen?
"A. Right.
"Q. All right.
 "A. There was an indication of criminal history in 1986 of a marijuana possession; but at that time, I couldn't verify whether or not he was actually the person who committed the offense or not. Sometimes your records are not exactly accurate.
 "Q. Going back to his profession as an engineer, would you say that the profession of an engineer is a scientific profession as opposed to speculative such as psychologists?
 "A. Well, the engineering profession, as I understand it to be, follows the scientific method."
Supplemental Record on Return to Remand, pp. 66-67. The defense indicated that its notes reflected that Juror 68 was not an engineer and that he had had only one year of college; however, there is no indication in the record on return to remand as to which assertion was correct, nor is there any indication *Page 420 
that the State had acted under anything other than a belief that Juror 68 was, in fact, an engineer. A prosecutor can strike based on a mistaken belief, see Taylor v. State,666 So.2d 36, 42 (Ala.Cr.App. 1994); therefore, it is logical that a prosecutor may also decide, based on a mistaken belief, not to strike a veniremember. Because the discrepancy in the way these two jurors were treated was adequately explained, we conclude that the strike of Juror 19 was race-neutral.
Finally, the State struck Juror 87 because of a 1986 violation of the child restraint law, coupled with a minor traffic offense, and struck Juror 121 because she was employed at Brockway Glass, where the district attorney's office had conducted a major embezzlement investigation. With regard to Juror 87, the State indicated some concern regarding the child restraint violation, because the facts of this present case involved the murder of a child. With regard to Juror 121, the prosecutor indicated a pending investigation at Brockway glass. While these strikes cause us the most concern, we have considered them in light of this Court's opinion inBui, and from the record we infer that the State did not strike these veniremembers for racial reasons. Again, we note:
 " 'It is within the sound discretion of the trial court to determine if peremptory challenges of black jurors were motivated by intentional racial discrimination. The court's findings in this regard are afforded great deference and will not be reversed on appeal absent clear error. Ex parte Lynn, 543 So.2d 709 (Ala. 1988).' "
Ex parte McNair, 653 So.2d 353, 357-58 (Ala. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995), quoting Jelks v. Caputo, 607 So.2d 177, 179 (Ala. 1992). Considering that this case was tried before Powers v. Ohio was decided; that this case involved a white defendant and two white victims and, according to the findings of the trial court, "had no racial overtones"; that over four years had elapsed between the trial and the Batson hearing, where the district attorney was required to give his reasons for his peremptory strikes; and that three blacks served on the jury, we do not find the trial judge's ruling to be clearly erroneous.
 II.
Brown also argues that the trial court failed to "life qualify" the jury. Relying on Morgan v. Illinois, 504 U.S. 719,112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), Brown contends that because the defense was not given the opportunity to find out if potential jurors would automatically vote for the death penalty if Brown was convicted, his sentence of death cannot stand. We disagree. In Morgan, the United States Supreme Court said:
 "We have also come to recognize that the principles first propounded in Witherspoon v. Illinois, 391 U.S. 510 [88 S.Ct. 1770, 20 L.Ed.2d 776] (1968), the reverse of which are at issue here, demand inquiry into whether the views of prospective jurors on the death penalty would disqualify them from sitting."
504 U.S. at 731, 112 S.Ct. at 2230-31. Brown requested that the following questions be asked of the jury veniremembers (the filing that contained the questions also contained the statements included here):
 "1. Do you have strong personal beliefs or feelings against the death penalty? If so, what are your beliefs?
 "2. Do you have strong personal beliefs or feelings in favor of the death penalty? If so, what are your beliefs?
 "3. Do you think that the death penalty is the only appropriate punishment for someone found guilty of Capital Murder? (Define 'Capital Murder'.)
 "4. If you answered yes to the previous question, do you think that you personally would in every case vote for the death penalty, as opposed to life in prison without parole, for a person found guilty of Capital Murder beyond a reasonable doubt?
 "5. Do you believe that life imprisonment without the possibility of parole may be an adequate punishment for capital murder?
 "6. The Court will instruct you that if you are selected as a juror you will take an oath which binds you, in the event of a *Page 421 
guilty verdict, to hear and fairly consider any evidence the Defense may present to convince you that the appropriate punishment would be life without parole. Would you be willing to hear such evidence and consider it in determining which of the two punishments should be imposed?
 "7. Would your personal feelings in favor of the death penalty prevent or substantially impair your ability to serve as a juror in this case in accordance with your oath and instructions?
 "8. If a juror should indicate in response to the above questions, or any others, that he/she has personal feelings and beliefs which run contrary to the death penalty, Defense counsel reserves the right to inquire of the juror so as to ascertain whether or not the juror's views would prevent or substantially impair the performance of his/her duties as a juror in accordance with his/her oath."
With regard to the death penalty, the trial court asked the venire the following questions:
 "As I stated to you, this case involves Mr. Brown being charged with four counts of capital murder [although Brown was charged with killing two people, the two murders were charged in four counts]. Because it's capital murder, those indictments include the possibility of the death penalty. I'll have to ask you now some questions concerning your views and thoughts and attitude about the death penalty. Again, I know that your answers to the questions are truthful because of the oath that you have taken.
 "Some people favor the death penalty, some people oppose it. I am going to try to ask you questions as candid as I can, to elicit from you your honest forthright view you have about the death penalty.
 "Does anyone have any personal beliefs or feelings about the death penalty one way or the other?
 "Anyone believe that the death penalty should never be imposed for any crime?
". . . .
 ". . . Anyone [who] believes that the death penalty is morally wrong, that the death penalty is morally wrong?
". . . .
 "Thank you. Anyone believe that you could never vote to impose the death . . . penalty, if the facts should warrant it . . .?
 "[Anyone] believe that your views on the death penalty would prevent or substantially impair your performance of your duty as a juror if you are selected to serve on this jury, to recommend a death sentence if the law and the facts called for a death sentence? Anyone believe that your views on the death penalty would prevent or substantially impair your performance of your duty as a juror if you are selected to serve on this jury, to recommend a death sentence if the law and the facts called for a death sentence?. . . .
". . . .
 "Is there anyone who has a strong personal belief or feeling in favor of the death penalty? Anyone that feels very strongly in favor of the death penalty? . . . ."
RT. 48-51. To the last two questions, there was no response from anyone on the venire. The State argues that the questions asked by the trial judge met the requirements of Morgan v.Illinois and were substantially the same initial inquiry the defense requested. Because no one responded to the questions, the State contends, there was no need to ask further questions. In addition, the State points out that Brown did not object to the failure of the court to ask "life qualifying" questions. While the failure to object does not prevent us from reviewing this issue, we review it under the "plain error" standard.Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd,577 So.2d 531 (Ala. 1991), cert. denied, 502 U.S. 886,112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Pursuant to that standard, this Court has held that the failure to ask reverse-Witherspoon
questions sua sponte does not rise to the level of plain error. See Dill v. State, 600 So.2d 343, 363 (Ala.Crim.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924,113 S.Ct. 1293, 122 L.Ed.2d 684 (1993), citing Henderson v.State, 583 So.2d 276 (Ala.Crim.App. 1990). Brown requested the "life qualifying" question if there were veniremembers whoanswered that they were strongly in *Page 422 favor of the death penalty. No one answered the trial court's question in the affirmative. The trial judge, therefore, in not going further with questions in that vein, was doing exactly what was requested of him by the defense. The defense did not object to the trial court's failure to question the veniremembers further; no plain error occurred.
 III.
Brown contends that the trial judge, when instructing the jury on the charges of capital murder, did not instruct the jury regarding the element of intent. Our review of the overall instructions to the jury indicates otherwise. The judge charged the jury as follows:
 "Now, the defendant is charged with capital murder. . . . First of all, murder is the same as a homicide, that is taking the life of another person, unjustifiable, at least the State claims.
 "So, the defendant is charged with capital murder. The law says as related to this case, the defendant is charged with four counts. Four counts, one indictment, but four counts, separate and distinct counts of capital murder. The law says as related to this case, one is guilty of capital murder if the murder is committed while the defendant is under sentence of life imprisonment. So therefore, before you could find the defendant guilty of capital murder for any of the counts of murder, you have to be satisfied that the defendant was under a sentence of life in the penitentiary.
 "Also, the law says, [§] 13A-5-40, [Ala. Code 1975,] that one would be guilty of capital murder or charged with capital murder if there's murder by the defendant during sexual abuse in the first or second degree, or an attempt thereof committed by the defendant. Before you could find the defendant guilty of capital murder under this particular paragraph, you have to find there was sexual abuse in the first or second degree, or an attempt thereof committed by the defendant during the course of the killing, the capital murder.
 "One is also to be charged or found guilty of capital murder wherein two or more persons are murdered by the defendant by one act, or pursuant to one scheme, or course of conduct.
 "That's the way the law defines capital murder. As I stated capital murder of course is the same as homicide. That is, the taking of the life of another human being. Capital murder of course moves into another category and I'll read these paragraphs again, not to overduly emphasize them but to make it clear to you, and I'll perhaps read all of the statutes twice, for your clarification.
 "Capital murder, murder committed while the defendant is under sentence of life in prison. Murder by the defendant during sexual abuse in the first or second degree, or an attempt thereof committed by the defendant. Capital murder is wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct.
 "And to capital murder, the defendant entered a plea of not guilty, and not guilty by reason of insanity. The court has already charged you on how the law defines reasonable doubt, on the not guilty, the court will further define shortly the law on insanity.
 "Also included in the indictment as a matter of law is the charge of murder, the charge of murder. The law says, [§] 13A-6-2, a person commits the crime of murder if with intent to cause the death of another person he causes the death of that person, or of another person. That's relevant to this case, and the court finds it necessary to charge you [on] murder and manslaughter as a matter of law.
 "Again, a person commits the crime of murder if with intent to cause the death of another person he causes the death of that person or of another."
R.T. at 1054-57. Brown argues that while the trial judge charged the jury regarding intent as to murder, his failure to include a charge on intent as to capital murder brings this case within the purview of Starks v. State, 594 So.2d 187
(Ala.Cr.App. 1991). In Starks, Judge Bowen, writing for the Court of Criminal Appeals, stated: *Page 423 
 "Under Alabama law, there are three forms of murder: 'intentional murder,' defined in § 13A-6-2(a)(1); 'reckless murder,' defined in § 13A-6-2(a)(2); and 'felony murder,' defined in § 13A-6-2(a)(3). However, the only form of murder that will support a conviction for the capital offense with which the appellant was charged is intentional murder; neither reckless murder nor felony murder will suffice. § 13A-5-40(b); Bui v. State, 551 So.2d 1094, 1115 (Ala.Cr.App. 1988), affirmed, 551 So.2d 1125 (Ala. 1989), vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712, remanded on other grounds, 627 So.2d 848 (Ala. 1991). See also Connolly v. State, 500 So.2d 57, 62 (Ala.Cr.App. 1985) (doctrine of felony murder 'has no place in securing a conviction' for capital robbery-murder), affirmed, 500 So.2d 68 (Ala. 1986); Daniel v. Thigpen,742 F. Supp. 1535, 1549 (M.D.Ala. 1990) (reckless murder not sufficient to support a conviction where defendant was charged with the capital offense of murder of a police officer under former § 13A-5-31(a)(5)).
". . . .
 "At the beginning of his charge, the trial judge read the indictment, which charged the appellant with intentional murder. Shortly thereafter, however, he discussed the elements of the charged capital offense using only the term 'murder.' He clearly did not include intent when enumerating the elements of the capital offense and stated that the term 'murder' would be defined later. Subsequently, when he did define the term 'murder,' he used both
the intentional form found in § 13A-6-2(a)(1) and the felony murder form found in § 13A-6-2(a)(3). Immediately after providing this dual definition of 'murder,' the trial judge referred to the charged offense of 'murder occurring in the commission or attempted commission of a dangerous felony' and then the 'lesser included offense of murder.' (Emphasis added.) The trial judge never instructed the jury that, in order to convict the appellant of the capital offense, it must find that he intentionally killed [the victim]. Furthermore, the trial judge failed to clearly distinguish the elements of the charged capital offense from those of the lesser included offense of felony murder."
594 So.2d at 193-94. As in Starks, the trial judge in this case made no reference to the element of intent when charging the jury on capital murder; however, unlike the situation inStarks, in this case there was only one definition of "murder" given to the jury — that "a person commits the crime of murderif with intent to cause the death of another person he causesthe death of that person, or of another person." R.T. at 1057. This definition immediately followed the charge regarding capital murder. In Starks, the instructions to the jury were confusing because the jury was given not only the definition of "murder," but also the definition of "felony murder." The Court of Criminal Appeals aptly pointed out in Starks that "the trial judge failed to clearly distinguish the elements of the charged capital offense from those of the lesser included offense of felony murder." Starks, 594 So.2d at 193-94. In Brown's case, however, there being no charge of felony murder to cause confusion, we conclude that the trial court's instructions, when considered in their totality, could not have caused the jury to believe that the element of intent was not a requirement for finding the defendant guilty of capital murder.
 CONCLUSION
We have considered each of the issues raised in the defendant's brief and we have searched the record for "plain error." We have found no reversible error.[6] Furthermore, *Page 424 
pursuant to § 13A-5-53(b), we have independently weighed the aggravating and mitigating circumstances and have considered the appropriateness of the death penalty in this case as compared to other capital cases. Having done so, we conclude that the judgment of the Court of Criminal Appeals affirming Brown's convictions and sentence of death by electrocution should be affirmed.
AFFIRMED.
HOOPER, C.J., and ALMON,* SHORES, KENNEDY, INGRAM, and BUTTS,*
JJ., concur.
MADDOX and HOUSTON, JJ., concur only in the result as to Issue I (the Batson issue) and concur as to the other issues.
[1] In Powers v. Ohio, the Supreme Court held that a defendant may object to race-based exclusions of venirepersons through peremptory strikes whether or not the defendant and the excluded person are of the same race. The Powers decision was released after the trial in this case.
[2] When this case was tried in 1988, Jimmy Evans was the district attorney; however, at the time of the Batson hearing, Mr. Evans was no longer district attorney, but was attorney general for the State of Alabama. For the purposes of this opinion, we will refer to Mr. Evans as the district attorney, because it was in that capacity that he tried this case.
[3] The defense attorneys contended at the hearing that their notes indicated that this juror was married. Nothing in the record indicates that at the time of the strikes the district attorney did not, in good faith, rely on the belief, albeit mistaken, that Juror 127 was single. " ' "A prosecutor may strike from mistake, as long as the assumptions involved are based on an honest belief and are racially neutral." ' Reese v.City of Dothan, 642 So.2d 511 (Ala.Cr.App. 1993)." Taylor v.State, 666 So.2d 36, 42 (Ala.Cr.App. 1994).
[4] The district attorney also apparently thought that Juror 79 did not have children. The record indicates that he may have been mistaken in that regard.
[5] Juror 137, discussed above, was also struck, in part, because of his religious beliefs. We have already determined that the striking of that juror was race-neutral, based on his age and the fact that he had no children.
[6] In addition to raising issues concerning his conviction and sentence, Brown also challenges the constitutionality of §15-12-21, Ala. Code 1975, which caps attorney fees for out-of-court work in capital cases at $1,000. This challenge has been extensively discussed and has been rejected. See Smithv. State, 581 So.2d 497, 526-29 (Ala.Crim.App. 1990), reversed on other grounds, 581 So.2d 531 (Ala. 1991), relying on Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied,474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Sparks v.Parker, 368 So.2d 528 (Ala. 1979), appeal dismissed,444 U.S. 803, 100 S.Ct. 22, 62 L.Ed.2d 16 (1979); and our more recent opinion in May v. State, 672 So.2d 1310 (Ala. 1995).
* Although Justice Almon and Justice Butts were not present at oral argument, they have listened to the tape of that oral argument.