Robin Myers was convicted of the capital offense of murder committed during the course of a burglary, Ala. Code 1975, §13A-5-40(a)(4), and the capital offense of murder during the course of a robbery, § 13A-5-40(a)(2). These convictions were based on one killing. The jury recommended a sentence of life imprisonment without the possibility of parole; the trial court rejected this recommendation and sentenced Myers to death by electrocution. In a unanimous decision, the Court of Criminal Appeals on May 24, 1996, affirmed Myers's conviction and death sentence. Myers v. State, 699 So.2d 1281 (Ala.Crim.App. 1996), and it later overruled his application for rehearing. We granted certiorari review pursuant to Rule 39(c), Ala.R.App.P. We affirm.
Although Myers presented 31 issues for us to review, we find it necessary to address only five of those issues — whether the trial court erred in denying Myers's challenges for cause regarding jurors who were biased in favor of police officers; whether the trial court erred in failing to instruct the jury on the lesser included offense of felony murder; whether the trial court erred in failing to adequately instruct the jury on the legal principles of intoxication; whether the trial court erred in allowing a state's witness to wrongly comment on Myers's post-Miranda silence; and whether, in light of the Court of Criminal Appeals' holding in Pace v. State, [CR-93-0740, Sept. 27, 1996] ___ So.2d ___ (Ala.Crim.App. 1996), the indictment against Myers should be dismissed and the case remanded to the trial court.
According to the pertinent facts as set forth in the Court of Criminal Appeals' opinion, the following occurred:
 "The evidence in this case showed that [Myers] unlawfully entered the home of Ludie Mae Tucker in the middle of the night. He stabbed Mrs. Tucker, and then ran into a bedroom, where he stabbed her houseguest and cousin, Marie Dutton. Mrs. Dutton survived the attack, but Mrs. Tucker died as a result of her injuries. As [Myers] was leaving the house, he took a videocassette recorder. He later traded this videocassette recorder for crack cocaine. [Myers] testified that he did not kill Mrs. Tucker or stab Mrs. Dutton. He stated that he found the videocassette recorder in some bushes behind his house and that he took it and traded it for cocaine."
699 So.2d at 1282.
Myers alleges that during voir dire examination Juror C. Smith admitted that he *Page 1287 
would give more weight to the testimony of a police officer than to the testimony of other witnesses. Myers challenged Juror C. Smith, based on what Myers contends were his views regarding the testimony of police officers. The trial court denied the challenge for cause.
Myers contends that the trial court erred in denying his challenge of C. Smith for cause. According to Myers, when the trial court failed to strike C. Smith for cause, it violated the principles of Uptain v. State, 534 So.2d 686
(Ala.Crim.App. 1988) (wherein the Court of Criminal Appeals held that jurors who indicate that they would believe a police officer's testimony over that of another witness lack impartiality and should be struck for cause and, quoting State v. Davenport,445 So.2d 1190, 1193-94 (La. 1984), stated: "`[a] juror . . . who will unquestionably credit the testimony of law enforcement officers over that of defense witnesses is not competent to serve' "); Mason v. State, 536 So.2d 127 (Ala.Crim.App. 1988) (which reinforces Uptain); and McCray v. State, 629 So.2d 729
(Ala.Crim.App. 1993) (quoting Uptain with approval). Therefore, he argues, he is entitled to a new trial.
The State argues that Myers's challenge for cause was directed at the wrong veniremember — that the veniremember Smith who responded to the questions regarding the testimony of the police officer was R. Smith (juror number 36), not C. Smith (juror number 33).[1]
In response to the State's argument about which veniremember Smith expressed views about believing the testimony of a police officer over that of one who is not a non-police officer, Myers argues that both defense counsel and the district attorney, who were present at trial and conducted the voir dire, agreed that it was C. Smith (juror number 33), not R. Smith (juror number 36), who commented about a police officer's testimony.
To justify a challenge of a juror for cause, there must be a statutory ground as set forth in Ala. Code 1975, § 12-16-150, or some other matter that discloses absolute bias or favor and leaves nothing to the trial court's discretion. See, Nettles v.State, 435 So.2d 146, 149 (Ala.Crim.App.), aff'd,435 So.2d 151 (Ala. 1983). See also, Clark v. State, 621 So.2d 309, 321
(Ala.Crim.App. 1992). The trial court's ruling on a challenge for cause is accorded great weight and will not be disturbed on appeal unless it is clearly shown to be an abuse of discretion.Nobis v. State, 401 So.2d 191 (Ala.Crim.App.), cert. denied,401 So.2d 204 (Ala. 1981).
During the trial court's qualifications of the jury venire, the trial court asked if there was anyone who knew why, if selected as a juror in this case, he could not give both the State and the defendant a fair and impartial trial. The following colloquy occurred:
 "Juror: . . . I am an ex-police officer from the State of Michigan.
". . . .
"Juror: As I say, I have been on the state's side.
 "The court: Well, do you think you can try this case, if you are selected to serve on the jury, on the law and the evidence as it comes to you throughout the course of the trial?
 "Juror: I would certainly try to stay open-minded, although I have been on the other dwelling on those types of issues. I would try to do that, yes.
"The court: What is your name, please?
"Juror: [R.] Smith."
The veniremembers were questioned in panels consisting of 12 persons. R. Smith and C. Smith were both on the second panel, and neither defense counsel nor the district attorney noted on the record that there were two Smiths on the same panel. When panel two was called, in response to the question whether anyone had ever worked in law enforcement, the following occurred:
 "[District attorney]: Have any of you at any time in your life worked in law enforcement, either as a police officer, deputy *Page 1288 
sheriff — Mr. Smith, I believe you mentioned that earlier today?
"Juror Smith: Yes.
"[District attorney]: Where was that and when?
"Juror Smith: Jackson, Michigan.
"[District attorney]: Jackson?
 "Juror Smith: Yes. I served in different departments.
 "[District attorney]: That's R. Smith. Mr. Smith, how long did you work as a police officer?
 "Juror Smith: I worked one year for a township. I had the reserve officer and I believe it was three and a half to four years on the City of Jackson Police Department.
"[District attorney]: How big of a city is that?
"Juror Smith: It's comparable to Decatur."
(Clearly, R. Smith was the Juror Smith in this instance.) Later during questioning, the following occurred:
 "[District attorney]: Do any of you have any close friends that work in law enforcement either here or somewhere else?
"(Juror R. Smith held hand up.)
 "[District attorney]: Mr. Smith, were these people that you knew when you were working up in Michigan?
"Juror Smith: Yes.
"[District attorney]: Nobody here?
"Juror Smith: No, not here."
Subsequently, a Juror Smith stated that he had had two chain saws stolen from his garage in Michigan. (Presumably, because R. Smith had previously stated that he had lived in Michigan, the Juror Smith whose chain saws were stolen was R. Smith.)
During later questioning, a Juror Smith stated that although he had never testified for the State, he had, "as a reserve officer," served as a "back-up witness." (Presumably, because R. Smith had been a reserve officer, the Juror Smith who had served as a back-up witness was R. Smith.)
Later, a Juror Smith responded again, as follows:
 "[District attorney]: Do any of you feel like what you saw or read or heard would bias or prejudice you in this case at this point? Do any of you feel like that?
"(Juror Smith raised hand.)
 "[District attorney]: Yes, sir, Mr. Smith? "Juror Smith: In 1991 I was traveling quite a bit but I always read the paper when I am home. I don [sic] recollect ever seeing this. I don't know.
 "[District attorney]: So since you can't remember reading anything about it, you don't feel like you would be prejudice [sic] in any way about it?
"Juror Smith: No."
(It is unclear whether R. Smith or C. Smith is the Juror Smith who answered these questions.)
In response to questioning about elderly victims, the following occurred:
 "[Defense counsel]: I want to find out now in what instance you might be more inclined to recommend a death penalty. For example, if it was shown to you — the fact that the victim is elderly, do you think that might make you more inclined to impose a death penalty? If so, let me know. Yes, sir?
 "Juror Smith: I want to say I have a lot of compassion for old people. I have a great-grandmother that I cared for.
"[Defense counsel]: You are R. Smith?
"Juror Smith. Yes.
 "[Defense counsel]: You think that might be a factor that you might consider?
 "Juror Smith: I would very much try to keep an open mind.
 "[Defense counsel]: All these things are things you would be allowed to consider. That's why I'm asking you questions this way. You would keep an open mind but that is a factor you might weigh a little more than some others?
 "Juror Smith: I have a lot of compassion for elderly people."
After further questioning, defense counsel specifically stated: *Page 1289 
 "[Defense counsel]: I will change the subject a little bit here. Mr. Smith, we haven't heard much from you so I'm going to ask you a question. Which is more important to you; that guilty people be convicted or innocent people be acquitted?
". . . .
"Juror Smith: I really don't know."
(Although only identified as Juror Smith, it is apparent that C. Smith is the one responding, because of the statement "we haven't heard much from you.")
Later in the proceedings, the following occurred:
 "[Defense counsel]: Is there anybody that thinks in our system that criminals have too many rights; that people who are charged with crimes have too many rights; that we spend too much time protecting their rights rather than making sure we seek the truth? Does anybody feel that way?
"(No response)
 "[Defense counsel]: Mr. Smith, I may know your answer to this and I may not, but how many of you would tend in a situation where a police officer testified that [it] happened a certain way and a non police officer said it happened another way, with nothing else to guide you, how many of you would believe the police officer over the other fellow?
"Juror Smith: I would believe the police officer."
(Although only identified as Juror Smith, presumably R. Smith is the one responding, because of the way the question was phrased — because the question refers to the testimony of a police officer and R. Smith had previously stated that he had been a police officer.)
After the trial court dismissed the second panel, defense counsel made four challenges for cause, one being directed toward C. Smith (Juror number 33):
 "[Defense counsel]: . . . Now, as to juror number 33, that juror we challenge for a different reason. I[t] would be a challenge for cause if a juror made some remark that [he] held an opinion other than what the law would require of them. In other words, I don't care what the law is, I have an opinion otherwise. As to juror number thirty-three, he responded if a police officer told you something and another person not a police officer told you something and you had nothing else but the two statements, would you believe the police officer first simply because they were a police officer. Of course, the law is very clear that a police officer's testimony is not entitled to any more weight than other people's testimony. It is viewed in the same light as anyone else's testimony. If a juror indicates that they would believe a police officer before they would believe any other witness or give added weight to their testimony and not view it in the same light as they would other witnesses, that is tantamount to a statement that they would not follow the jury charge given to them by this court. For that reason we challenge juror number thirty-three for cause.
". . . .
 "[District attorney]: Judge, my recollection of what juror number thirty-three said didn't come — I don't think he said anything close to the fact that he would ignore the judge's charge and believe a police officer more than anyone else. I didn't understand him to indicate that. I thought his answer was something like he would tend to believe the police officer more and it was not pursued. They don't have enough grounds for challenge for cause.
". . . .
 "The court: I will give [the numbers of the prospective jurors] and see if this is correct.
". . . .
 "The court: [O]n panel number two, . . . juror number thirty-three is Mr. Smith.
"[Defense counsel]: That's what I have."
From a thorough review of the record of the voir dire process, it is apparent that C. Smith seldom answered any questions, and it is apparent from all the circumstances that the Juror Smith who responded to the question about a police officer's testimony was R. Smith, not C. Smith. Nothing in the record shows that a challenge for cause should have *Page 1290 
been granted as to C. Smith. The trial court did not err in denying Myers's challenge for cause directed toward C. Smith.
Thus, the question becomes whether the trial court erred in not sua sponte removing R. Smith based on his response to the question about a potential juror's giving the testimony of a police officer more weight than the testimony of one who was not a police officer. Because Myers failed to object at trial to the trial court's failure to remove R. Smith for cause, this issue must be reviewed under the "plain error" rule. Under the plain error rule, this Court will "notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner." Rule 39(k), Ala.R.App.P.; see Ex parte McNair,653 So.2d 353 (Ala. 1994), cert. denied, 513 U.S. 1159,115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995).
R. Smith's response, by itself, to the question whether anyone would believe a police officer over one not a police officer "in a situation where a police officer testified that [it] happened a certain way and a non police officer said it happened another way, with nothing else to guide you," was not a sufficient reason for granting a challenge for cause. R. Smith's response to the question based on that narrow set of circumstances, in light of the entire voir dire questioning, did not indicate an absolute bias toward believing the police officer's testimony regardless of the other evidence presented and the trial court's instructions. In response to the trial court's question of the venire whether "if selected as a juror in this case, he could not give both the State and the defendant a fair and impartial trial" — whether he thought that he could "try this case, if [he was] selected to serve on the jury, on the law and the evidence as it [came] to [him] throughout the course of the trial," R. Smith responded, "I would certainly try to stay open-minded, although I have been on the other dwelling on those types of issues. I would try to do that, yes." We find no plain error in the trial court's failure to sua sponte remove R. Smith from the jury for cause.
Myers also maintains that the trial court erred in failing to instruct the jury on the felony-murder doctrine. He contends that the evidence in this case is virtually identical to the evidence in Starks v. State, 594 So.2d 187
(Ala.Crim.App. 1991) (in which the Court of Criminal Appeals held that the State presented testimony that supported the theory that the killing occurred during a planned robbery, but that the defendant was entitled to a lesser included offense instruction on felony murder, which required no intent for the killing, because there was no testimony of a planned killing, only of a planned robbery, and no evidence that the defendant had a weapon when he entered the store he intended to rob). According to Myers, the evidence, when considered in the light most favorable to the State, could have convinced the jury that although he had a motive and intended to rob the victim of her VCR in order to obtain drugs, he did not plan to kill her — i.e., that he did not have the specific intent to kill her. Therefore, he says, the evidence clearly supported a charge on the lesser included offense of felony murder.
The State maintains that there was no evidence to support a charge on the lesser-included offense of felony murder. Rather, it argues, the evidence showed, among other things, that Myers was allowed into the victim's house under the pretense of wanting to use her telephone; that he stabbed her four times and that the stabbings resulted in her death; and that upon leaving the house, he took a VCR, which he traded for a rock of cocaine. According to the State, Myers's reliance on Starks v.State, supra, for his argument that he was entitled to a jury charge on felony murder is misplaced, because, it says, Starks
is factually dissimilar to this case.
A defendant is entitled to a charge on a lesser-included offense if there is a reasonable theory to support such a charge, Ex parte Oliver, 518 So.2d 705 (Ala. 1987), even if the defendant denies committing the crime, Ex parte Pruitt,457 So.2d 456 (Ala. 1984), and even if the evidence supporting *Page 1291 
the charge is offered by the State, id.; Chavers v. State,361 So.2d 1106 (Ala. 1978). See Daniels v. State, 534 So.2d 628
(Ala.Crim.App. 1985), judgment aff'd, Ex parte Daniels,534 So.2d 656 (Ala. 1986), cert. denied, Daniels v. Alabama,479 U.S. 1040,107 S.Ct. 898, 93 L.Ed.2d 850 (1987). "A charge on a lesser, non-capital offense is required only when there is a basis in the evidence which provides a reasonable theory supportive of the charge. Beck v. State, 396 So.2d 645
(Ala. 1980)." Godbolt v. State, 429 So.2d 1131, 1134
(Ala.Crim.App. 1982). See Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049,72 L.Ed.2d 367 (1982); Beck v. Alabama, 447 U.S. 625,100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); Chavers v. State, supra;Fulghum v. State, 291 Ala. 71, 277 So.2d 886 (1973).
In Starks, five men were indicted for capital murder. Only two of the five were tried for capital murder; the other three testified against Starks and his uncle in exchange for being charged with an offense less than capital murder. In Starks, the evidence indicated that the killing was committed during a planned robbery, but there was no testimony of any plan to kill the victim, and one of the co-defendants testified that Starks had no weapon when he entered the store. Starks, supra. Therefore, the Court of Criminal Appeals held that, based on the evidence, Starks was entitled to a jury charge on the lesser-included offense of felony murder because "whether [he] intended to kill the victim during the commission of [the] robbery was a question for the jury." Starks, supra, 594 So.2d at 195.
From a thorough review of the record, we conclude that, as the State contends, there was no testimony that Myers had not planned to kill his victim and no testimony that he was not armed with a knife before he entered the victim's house. Rather, although ever since he was arrested Myers has maintained his innocence of the murder and has insisted that he found the VCR and then traded it for drugs, the evidence established that Myers gained entry into the victim's house by deception, that he pretended to use the telephone, that he stabbed and killed his victim, and that he took the victim's VCR to trade for crack cocaine. That evidence could support only a conviction of the capital offense for which Myers was charged in the indictment. We find no evidence to support a theory of felony murder. The trial court did not err in failing to give an instruction on felony murder.
Myers further argues that the trial court failed to adequately instruct the jury on the legal principles of intoxication[2] — that it erred by not instructing the jury that while intoxication neither excuses nor palliates a crime, it may negate the element of intent. According to Myers, had the jury been given a proper instruction on intoxication, it could have found that his use of crack negated any specific intent to kill.
The State concedes that the trial court did not expressly instruct on how a defendant's intoxication could prevent the defendant from forming or having a specific intent required as an element of a particular offense, but it maintains that the jury could infer that the instructions on manslaughter and the instructions on voluntary intoxication were related to each other because those two instructions were given together. According to the State, the trial court used the word "recklessly" only when it instructed the jury on manslaughter and voluntary intoxication — this fact, the State says, created an inference that the instructions were to be applied together — and, the State says, when the trial court instructed on capital murder it always emphasized that a specific intent to kill was required as an element of that offense.
Although Myers acknowledges the State's concession, he nonetheless points out that this is a death penalty case and argues that it is not the jury's role to infer from the juxtaposition of instructions what the instructions really mean. He argues that it is unreasonable to assume that the jury can infer how instructions relate to one another. *Page 1292 
The jury charge on intoxication was as follows:
 "A person acts recklessly with respect to a result or to a circumstance when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates a risk[,] but is unaware thereof solely by reason of voluntary intoxication, acts recklessly with respect thereto. Voluntary intoxication means intoxication caused by substances that the actor knowingly introduced into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them under circumstances that would afford a defense to a charge of crime. If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of manslaughter, then you shall find the defendant guilty of manslaughter. If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of manslaughter, then you cannot find the defendant guilty of manslaughter."
After the trial court had instructed the jury, defense counsel objected, as follows:
 "[Defense counsel]: My exception comes under the case of [Fletcher v. State]. When your Honor was giving the definition of manslaughter and mentioned intoxication, in the Fletcher case intoxication can also be under severe influence of crack cocaine. Lots of times juries think when a judge says intoxication he means alcohol. That's what it [has] traditionally come to mean and the court did not indicate that under the influence of narcotics or crack cocaine can also be intoxication."
Following defense counsel's objection, the trial court brought the jury back into the courtroom and gave the following curative instruction:
 "The court: . . . I want to instruct you . . . when I was giving you earlier instructions and discussing with you intoxication, I will tell you that some people believe that intoxication refers only to drinking or alcohol or something of that nature. That would be included but it would not be limited to that. I instruct you that intoxication could be caused from drugs such as crack cocaine or something of that nature. I will also instruct you, to make sure you understand in what context that instruction is given, that that instruction is given with regard to the lesser included offense of manslaughter. Within the offense of capital murder as charged in each of the . . . counts of the indictment is the lesser included offense of manslaughter. If after your consideration of the offenses charged in the indictment in accordance with the instructions that I have given you, you are not convinced beyond a reasonable doubt that the defendant is guilty of the offense of capital murder as charged in each of the . . . counts of the indictment, you cannot find the defendant guilty of that offense. Instead, you must next consider the evidence as to the lesser included offense of manslaughter and determine whether the defendant has been proved guilty beyond a reasonable doubt of the lesser included offense. If you find from the evidence that the State has proved beyond a reasonable doubt each of the elements of the lesser included offense, then you shall find the defendant guilty of manslaughter. If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of manslaughter, then you cannot find the defendant guilty of the offense of manslaughter. A person commits the crime of manslaughter if he recklessly causes the death of another person. To convict, the State must prove beyond a reasonable doubt each of the following elements of manslaughter: one, that Ludie Mae Tucker is dead; and two, that the defendant Robin Myers recklessly caused the death of Ludie Mae Tucker by stabbing her to death with a knife or other sharp instrument. A person acts recklessly with respect to a result or to a circumstance when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the *Page 1293 
circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates a risk[,] but is unaware thereof solely by reason of voluntary intoxication, acts recklessly with respect thereto. Voluntary intoxication means intoxication caused by substances that the actor knowingly introduced into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them under circumstances that would afford a defense to a charge of crime. If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of manslaughter, then you shall find the defendant guilty of manslaughter. If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of manslaughter, then you cannot find the defendant guilty of manslaughter."
(Emphasis added.) This curative instruction clearly apprised the jury that it could consider manslaughter if it found that Myers was so intoxicated that he acted recklessly and did not act with the specific intent to kill. Given the language of the curative instruction, we conclude that the instruction on intoxication was complete and adequate.
Myers next argues that the trial court allowed Officer Dwight Hale, a sergeant with the Decatur Police Department and a witness for the State, to comment on Myers's post-Miranda-warning silence. He argues that Officer Hale's testimony was "a direct comment on [Myers's] choice to remain silent after he was advised of his rights and after the interrogating officers explicitly told him that they would not believe anything he said."
Any comment on a defendant's silence after Miranda warnings are given is fundamentally unfair and is repugnant to the principles embodied in the 5th and 14th Amendments. Introducing evidence that the defendant elected to remain silent when confronted with accusations violates the defendant's Fifth Amendment right to remain silent and his Fifth and Fourteenth Amendment rights to due process. Doyle v. Ohio, 426 U.S. 610,96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); Ex parte Harris,387 So.2d 868 (Ala. 1980); Ex parte Johnson, 629 So.2d 619 (Ala. 1993). See also Ex parte Marek, 556 So.2d 375, 382 (Ala. 1989), in which the Court, noting that the use of tacit admissions occurring after an individual had been given the Miranda
warnings had been abolished in Ex parte Harris, supra, abolished the tacit admission in pre-arrest cases "to the extent that the rule allows the introduction of evidence of an accused's silence when confronted with an accusation."
 "[E]very post-arrest silence is insolubly ambiguous. . . . Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used [against him] at trial."
Doyle, 426 U.S. at 617-18, 96 S.Ct. at 2244-45, citing UnitedStates v. Hale, 422 U.S. 171, 177, 95 S.Ct. 2133, 2137,45 L.Ed.2d 99 (1975). In Ex parte Harris, supra, at 871, this Court held that it was "fundamentally unfair and in violation of due process of law to inform a person under arrest that he has a right to remain silent and then permit an inference of guilt from that silence." See, also Ex parte Brooks,562 So.2d 604 (Ala. 1990). "A comment is deemed to be a reference to a defendant's silence if . . . the remark was of such a character that the jury would 'naturally and necessarily' take it to be a comment on [the] defendant's silence. . . . The standard is strict; virtually any description of a defendant's silence following arrest and a Miranda warning will constitute a Doyle
violation." United States v. Rosenthal, 793 F.2d 1214, 1243
(11th Cir. 1986).
Officer Dwight Hale testified that he read Myers hisMiranda rights and that he had given Myers a form to read along with him. (Officer Hale then read the form to the jury.) Officer Hale testified that Myers signed the waiver-of-rights form. Officer Hale further testified that Myers always denied *Page 1294 
killing the victim but admitted that he had "sold" the VCR. The pertinent portions of Officer's Hale's testimony are as follows:
 "After we got some personal information from [Myers] as to where he stayed and a little bit of his family background and where he was from, we ask[ed] him if he knew the victim in this case. . . . He stated he did not personally know her but he had seen her before because he lived across the street from her. We ask if he had ever been in her residence before and he said he never had been over there on the property before or in her house. We ask[ed] him if he had ever been over there and done any yard work or anything like that for her and he repeated again, 'no, I haven't, and if I remembered it I would tell you that.' We ask[ed] him if he was familiar with her death and us investigating it and he said yes, he had seen the police over there that night that she had died. . . . Then we got into asking him if he understood we had some fingerprints and stuff out of the residence and off some of the property that was taken and we were going to ask him again and wanted him to be certain, was he ever in that residence. He said 'no, I wasn't in the residence' was his answer, and then we said we had some different information and that he ought to think about it before he answered that. We told him we were going to ask him again. He thought about it and said 'I remember one time I was over there and I borrowed some ice cubes from her but I didn't go in the house.' We said 'are you sure you didn't go in the house because we told you we got some fingerprints and we sent those to the lab.' We had his prints sent off to be compared with them. We said 'before we get the results we are asking you now to tell us the truth.' He said 'no, I never been in the house or touched her telephone or nothing.' We did not solicit whether he had touched her telephone or anything. He volunteered that. . . . We talked with him several minutes about [the VCR] and he kept denying ever selling the VCR. . . . We said 'well, why would [one of] your good friend[s] lie on you because he saw you sell the VCR. . . .' He just dropped his head and wouldn't say anything. After a few minutes talking with him we told him that — he denied — he said he didn't kill the woman. He said 'I didn't kill that woman, I didn't steal that VCR or anything.' At that point we said 'we are not asking you if you killed the woman. What we are trying to confirm with you is the fact that you sold the VCR. Everybody said you did. We are not saying you killed anyone.' He thought about it a minute and said 'well, I did sell the VCR but I didn't kill the woman.' . . . He had already told us he had a family; a wife and four children, and we ask[ed] him how he got money to support them and did he steal to support them if not to support his habit and he really got into it then and told us how bad his habit was and he was using cocaine and that was his problem. He couldn't help some of the stuff he done, that's why he took the VCR, but he didn't steal it. He said he found it. . . . We got into it again about his cocaine habit and that being most of the problems and told him that we knew from what he told us, he had lied to us and there was no doubt that he did go in the house where [the victim] was. We had witnesses that saw him running across the yard with the VCR in his arm. He went to denying things and said 'those folks are lying on [me].' We said 'there is too many people that saw you and you have lied to us and there is no reason to believe you at this point.' He dropped his head and wouldn't say anything for a few minutes. I told him I knew he did go in the house, but at this point I didn't know what had transpired. I didn't know if the woman had pulled the knife on him or what it was.
". . . .
 ". . . I told him I wasn't sure what had taken place in the house, whether she had pulled the knife or whether he was trying to defend himself or whatever, but it was left up to us to go on the evidence and the fact she was there and had multiple stab wounds [and to conclude] that he went in and stabbed her and took the VCR. If he wanted to make a statement, we would take the statement and write it down or anything he could tell us we would investigate *Page 1295 
it to the fullest to give him any assistance at all. He just dropped his head and wouldn't say anything. After a while he began to cry. He ask[ed] could he call his mother."
Myers contends that the above-quoted testimony illustrates a direct accusation by Officer Hale to which Myers chose to remain silent and, therefore, he argues that any reference in that testimony to Myers's not talking or making a statement constituted an improper comment on Myers's exercise of his constitutional right to remain silent.
The State maintains that Officer Hale's testimony indicates that Myers always denied killing the victim and that the last of the above-quoted testimony is a rambling discourse on a theory of what may have occurred and that Myers's silence, after this and after having constantly denied his guilt, did not imply guilt.
Myers testified at trial that the interrogation lasted longer than three and one-half to four hours (as Officer Hale testified); that he became upset during the interview and "may have" cried some; that he asked to call his mother; that when the officers told him that they were accusing him of a crime that could result in his execution, he "was scared and . . . wanted to call [his] mother"; that after the officers told him there was no use in believing anything he said, he quit saying much of anything. He further testified that he never told the officers he killed the victim; that he did nothing but deny it. He testified that he got very tired after listening to the questions. He faced the victim's daughter and said "I did not kill your mother"; and he faced the jury and said, "I did not kill Mrs. Ludie Mae Tucker." He testified that after the police officers told him they had found some fingerprints, he admitted to them that he had touched the VCR because he had pawned it, but that even after the officers said that they had found fingerprints in the house, he still said he had never been in the house in his life.
In closing argument, the prosecutor did not comment on Myers's silence.
The trial court charged the jury as follows:
 "In this case certain statements made by [Myers] while in custody have been admitted into evidence. In determining what weight to give these statements you may consider the personal characteristics of [Myers] and his mentality in determining what weight and credibility to give [his] statement.
 "A statement by a person arrested is not voluntary if it is the product of either physical or psychological coercion.
 "In considering what weight to give the accused's statement one factor you can consider is the length of time he was subjected to interrupted interrogation.
". . . .
 "Each juryman must be separately satisfied beyond a reasonable doubt and to a moral certainty that the accused committed the crime at issue.
 "You should weigh all the evidence and reconcile it, if possible but if there [are] irreconcilable conflicts in the evidence, you ought to take that evidence which you think worthy of credit and give it such weight as you think it is entitled.
 "The law presumes that the accused has testified truthfully in this case, and it is your duty to reconcile his testimony with the testimony of all the other witnesses in the case with the presumption that he is innocent if you can reasonably do so.
 "The accused has testified in his own behalf. He has a right to do that. The law says that he may or may not, but he has elected in this case to testify. You are authorized to weigh the accused's testimony in the light of his interest in this case. Of course, he is interested because he is the accused, but it does not follow necessarily that because he is the defendant he is not telling the truth. But if you cannot reconcile his testimony and make it speak the truth, then you are authorized to weigh that testimony in the light of his interest in the case.
 ". . . You are charged with the responsibility of finding the truth by applying your common sense, your everyday experience, your practical insight about people and life to whatever you have heard in this Courtroom. *Page 1296 
 "Under the law Robin Myers is a competent witness in his own behalf. You shouldn't discredit his testimony merely because he is charged with a crime. His testimony should be weighed like the testimony of any other witness. Considerations of interest, appearance, manner and other matters bearing upon credibility apply to Robin Myers the same way they do to all other witnesses in this case."
From reviewing the record, we conclude that Hale's testimony was not of such a character that the jury would "naturally and necessarily" have taken it to be a comment on Myers's silence — that is, it did not call attention to Myers's silence at the time of his arrest in such a way as to allow the jury to draw an unfavorable inference.
Myers next argues that the Court of Criminal Appeals' holding in Pace v. State, [CR-93-0740, Sept. 27, 1996] ___ So.2d ___ (Ala.Crim.App. 1996), establishes, as a matter of law, that the foreperson of the grand jury that indicted him was selected in a racially discriminatory manner, and, therefore, he argues, the indictment entered against him should be dismissed.[3]
This issue was not presented to the trial court or to the Court of Criminal Appeals but was first raised in this Court. Therefore, we must review this issue under the plain error rule.
 "Under the plain error rule, this Court will 'notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has affected the substantial rights of the petitioner.' . . . Rule 39(k), Ala.R.App.P. As this Court stated in Ex parte Watkins, 509 So.2d 1074, 1077 (Ala. 1987), cert. denied, Watkins v. Alabama, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987) [in which this Court had the opportunity in a death penalty case to remand for an evidentiary hearing on a Batson issue, but refused to do so], '[t]he defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which the error is predicated ever occurred.' "
Ex parte McNair, 653 So.2d 353, 360 (Ala. 1994), cert. denied,513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995) (emphasis added in McNair).
The record is silent with respect to the racial composition of the grand jury that returned the indictment against Myers. In effect, by relying on Pace, Myers is requesting that we dismiss the indictment against him based on an intermediate appellate court's nonfinal holding that is now pending before this Court on certiorari review. We decline this request, "for to [accept it] would unduly enlarge the scope of the plain error review as authorized by our appellate rules." Ex parteMcNair, supra, at 360; see, also Ex parte Watkins,509 So.2d 1074 (Ala. 1987). We find nothing on the record that would justify a dismissal of the indictment.[4]
[1] Defense counsel used a peremptory strike to remove R. Smith from the jury; C. Smith served on the jury.
[2] " 'The law concerning drug intoxication is the same as for alcohol intoxication. See Commentary, § 13A-3-2, Code of Alabama 1975.' " Fletcher v. State, 621 So.2d 1010, 1019 n. 3 (Ala.Crim.App. 1993) (quoting Hooks v. State, 534 So.2d 329,352 (Ala.Crim.App. 1987)).
[3] Myers was indicted for capital murder by a grand jury in Morgan County seven months before Pace was indicted for capital murder in the same county.
[4] We note the United States Supreme Court cases of Rose v.Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), and Hobby v. United States, 468 U.S. 339, 104 S.Ct. 3093,82 L.Ed.2d 260 (1984). In Hobby, the United states Supreme Court discussed alleged discrimination in the selection of a grand jury foreperson and held as follows:
 "Invoking the Due Process Clause of the Fifth Amendment, [Hobby] argues that discrimination in the selection of grand jury foremen requires the reversal of his conviction and dismissal of the indictment against him. In Peters v. Kiff, 407 U.S. 493 [92 S.Ct. 2163, 33 L.Ed.2d 83] (1972), the opinion announcing the judgment discussed the due process concerns implicated by racial discrimination in the composition of grand and petit juries as a whole. Emphasizing the defendant's due process right to be fairly tried by a competent and impartial tribunal, see In re Murchison, 349 U.S. 133, 136 [75 S.Ct. 623, 625, 99 L.Ed. 942] (1955), the opinion reasoned that unconstitutionally discriminatory jury selection procedures create the appearance of institutional bias, because they 'cast doubt on the integrity of the whole judicial process.' 407 U.S., at 502 [92 S.Ct., at 2168]. Moreover, the opinion perceived an important societal value in assuring diversity of representation on grand and petit juries:
 " 'When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.' Id., at 503-504 [92 S.Ct., at 2169] (footnote omitted).
 "Discrimination in the selection of grand jury foremen — as distinguished from discrimination in the selection of the grand jury itself — does not in any sense threaten the interests of the defendant protected by the Due Process Clause. Unlike the grand jury itself, the office of grand jury foreman is not a creature of the Constitution; instead, the post of foreman was originally instituted by statute for the convenience of the court. . . . Today, authority for the appointment of a grand jury foreman is found in Federal Rule of Criminal Procedure 6(c), which provides [that the responsibilities of the grand jury foreman are essentially clerical in nature.]
". . . .
 ". . . [T]he impact of a federal grand jury foreman upon the criminal justice system and the rights of persons charged with crime is 'minimal and incidental at best.' [United States v. Hobby, 702 F.2d 466, 471 (4th Cir. 1983).] Given the ministerial nature of the position, discrimination in the selection of one person from among the members of a properly constituted grand jury can have little, if indeed any, appreciable effect upon the defendant's due process right to fundamental fairness. Simply stated, the role of the foreman of a federal grand jury is not so significant to the administration of justice that discrimination in the appointment of that office impugns the fundamental fairness of the process itself so as to undermine the integrity of the indictment.
 "Nor does discrimination in the appointment of grand jury foremen impair the defendant's due process interest in assuring that the grand jury includes persons with a range of experiences and perspectives. The due process concern that no 'large and identifiable segment of the community [be] excluded from jury service,' Peters v. Kiff, 407 U.S., at 503
[92 S.Ct., at 2169], does not arise when the alleged discrimination pertains only to the selection of a foreman from among the members of a properly constituted federal grand jury. That the grand jury in this case was so properly constituted is not questioned. No one person can possibly represent all the 'qualities of human nature and varieties of human experience,' ibid., that may be present in a given community. So long as the composition of the federal grand jury as a whole serves the representational due process values expressed in Peters, discrimination in the appointment of one member of the grand jury to serve as its foreman does not conflict with those interests.
 "The ministerial role of the office of federal grand jury foreman is not such a vital one that discrimination in the appointment of an individual to that post significantly invades the distinctive interests of the defendant protected by the Due Process Clause. Absent an infringement of the fundamental right to fairness that violates due process, there is no basis upon which to reverse [Hobby's] conviction or dismiss the indictment.
". . . .
 ". . . Rose [v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979),] involved a claim brought by two Negro defendants under the Equal Protection Clause. As members of the class allegedly excluded from service as grand jury foremen, the Rose defendants had suffered the injuries of stigmatization and prejudice associated with racial discrimination. The Equal Protection Clause has long been held to provide a mechanism for the vindication of such claims in the context of challenges to grand and petit juries. . . . [Hobby], however, has alleged only that the exclusion of women and Negroes from the position of grand jury foreman violates his right to fundamental fairness under the Due Process Clause. As we have noted, discrimination in the selection of federal grand jury foremen cannot be said to have a significant impact upon the due process interests of criminal defendants. Thus, the nature of [Hobby's] alleged injury and the constitutional basis of his claim distinguish his circumstances from those of the defendants in Rose.
 "Moreover, Rose must be read in light of the method used in Tennessee to select a grand jury and its foreman. Under that system, 12 members of the grand jury were selected at random by the jury commissioners from a list of qualified potential jurors. The foreman, however, was separately appointed by a judge from the general eligible population at large. The foreman then served as `"the thirteenth member of each grand jury organized during his term of office, having equal power and authority in all matters coming before the grand jury with the other members thereof."' Rose v. Mitchell, supra, at 548, n. 2 [99 S.Ct. at 2996, n. 2] (quoting Tenn. Code Ann. § 40-1506 (Supp. 1978)). The foreman selection process in Rose therefore determined not only who would serve as presiding officer, but also who would serve as the 13th voting member of the grand jury. The result of discrimination in foreman selection under the Tennessee system was that 1 of the 13 grand jurors had been selected as a voting member in an impermissible fashion. Under the federal system, by contrast, the foreman is chosen from among the members of the grand jury after they have been empaneled, see Fed. Rule Crim. Proc. 6(c); the federal foreman, unlike the foreman in Rose, cannot be viewed as the surrogate of the judge. So long as the grand jury itself is properly constituted, there is no risk that the appointment of any one of its members as foreman will distort the overall composition of the array or otherwise taint the operation of the judicial process.
 "Finally, the role of the Tennessee grand jury foreman differs substantially from that of the foreman in the federal system. . . . The investigative and administrative powers and responsibilities conferred upon the grand jury foreman in Tennessee, who possessed virtual veto power over the indictment process, stand in sharp contrast to the ministerial powers of the federal counterpart, who performs strictly clerical tasks and whose signature on an indictment is a mere formality. Frisbie v. United States, 157 U.S. 160
[15. S.Ct. 586, 39 L.Ed. 657] (1895); see supra, [468 U.S.] at 344-345 [104 S.Ct. at 3096-97].
 "Given the nature of the constitutional injury alleged in Rose, the peculiar manner in which the Tennessee grand jury selection operated, and the authority granted to the one who served as foreman, the Court assumed in Rose that discrimination with regard to the foreman's selection would require the setting aside of a subsequent conviction, 'just as if the discrimination proved had tainted the selection of the entire grand jury venire.' Rose v. Mitchell, 443 U.S., at 551-552, n. 4 [99 S.Ct., at 2997-98, n. 4]. No such assumption is appropriate here, however, in the very different context of a due process challenge by a white male to the selection of foremen of federal grand juries."
468 U.S. at 343-49, 104 S.Ct. at 3095-98.
Applying the reasoning of the United States Supreme Court inHobby and recognizing that a review under the plain error rule, which guarantees a defendant a fundamental right to fairness, is tantamount to a due process review, we conclude that, under the facts of this case, assuming discrimination entered into the selection of the grand jury foreperson in Morgan County, that discrimination does not warrant the reversal of the conviction against Myers under the plain error rule. The role of the grand jury foreperson in Morgan County, whose powers were primarily ministerial, Rule 12.5, Ala.R.Crim.P., was "not so significant to the administration of justice that discrimination in the appointment of that office impugn[ed] the fundamental fairness of the process itself so as to undermine the integrity of the indictment" against Myers.468 U.S. at 345, 104 S.Ct. at 3097. Furthermore, so long as the grand jury itself was properly constituted, there was no risk that the appointment of one of its members as foreman distorted "the overall composition of the array or otherwise taint[ed] the operation of the judicial process." 468 U.S. at 348,104 S.Ct. at 3098. In this case, nothing in the record and nothing argued to this Court indicates that the grand jury was not properly constituted. *Page 1297 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1298 
In addition to addressing the foregoing issues, this Court has reviewed the other issues presented to it; has examined the issues addressed and resolved by the Court of Criminal Appeals; has considered the arguments made before this Court on oral argument; and has thoroughly examined the record for plain error. We find no error, plain or otherwise, either in the guilt phase or in the sentencing phase of Myers's trial that so prejudicially affected his rights as to require a reversal of Myers's conviction and sentence. The judgment of the Court of Criminal Appeals affirming Myers's conviction and sentence is therefore affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, SHORES, KENNEDY, BUTTS,* and SEE, JJ., concur.
COOK, J., concurs in the result.
* Although Justice Butts was not present at oral argument in this case, he listened to the tape of oral argument, on April 1, 1997.